NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| STEPHON DOWNER, | : | |
| | : | |
| Petitioner, | : | |
| | : | Civil Action No. 11-6414 (RMB) |
| v. | : | |
| | : | **O P I N I O N** |
| CHARLES WARREN et al., | : | |
| | : | |
| Respondents. | : | |

**BUMB**, District Judge:

Petitioner Stephon Downer ("Petitioner") filed a petition ("Petition") seeking a writ of habeas corpus under 28 U.S.C. § 2254(a), challenging a judgment of conviction entered by the Superior Court of New Jersey. See Docket Entry No. 1.[1] The Court advised Petitioner of his rights under Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and directed Respondents to answer. See Docket Entries Nos. 3 and 5. Petitioner moved for an evidentiary hearing seeking to enlarge the record presented to, and ruled upon, by the state courts. See Docket Entry No. 12. Pursuant to Cullen v. Pinholster, 131 S. Ct. 1388 (2011), the Court denied that motion. See Docket Entry No. 17. Respondents answered the

---

[1] The Petition, a 68-page submission, was accompanied by a 63-page memorandum and a 59-page appendix further detailing Petitioner's challenges. Although such mode of pleading was facially not in compliance with the requirements of Habeas Rule 2(d), the Court, mindful of Petitioner's pro se litigant status and being able to discern Petitioner's many claims raised in multiple submissions, found it unnecessary to direct a re-pleading.

Petition and filed the underlying record, that exceeded 1,100 pages, and Petitioner traversed.  <u>See</u> Docket Entries Nos. 18 and 22.

For the reasons detailed below, the Petition will be denied. No certificate of appealability will issue.

## I.  <u>BACKGROUND</u>

Addressing Petitioner's direct appellate challenges, the Superior Court of New Jersey, Appellate Division ("Appellate Division"), summarized the events underlying Petitioner's conviction as follows:

> On the night of March 6, 1997, Carlos Ruiz, Edelmiro Robles and two other individuals went to Westfield Acres, a housing project in Camden, to purchase marijuana.  Ruiz had $10 on his person for the intended purchase.  Ruiz and Robles had purchased marijuana there three days earlier.  Ruiz and Robles got out of the car while the two companions waited inside the car.  Once they got out of the car, Ruiz and Robles were encountered by an individual, later identified as Petitioner, and another individual who directed Ruiz and Robles to proceed to a particular building.  When Ruiz and Robles approached the building, Petitioner told Robles to stay outside and told Ruiz to enter the building. Ruiz and Robles complied.  Petitioner then placed a handgun to Robles' head and began going through his pockets to rob him, but Robles had nothing of value.  During this encounter, Robles observed Petitioner face-to-face and saw him clearly. Moreover, Robles had also seen Petitioner at this location when he was there three days earlier.  Ruiz meanwhile had gone to the second floor inside the building.  Petitioner left Robles and went up the stairs.  Robles, who remained downstairs heard Ruiz utter an exclamation of surprise.  He then heard a gunshot.  Robles ran from the building to the two friends waiting in the car. As he was leaving the scene, he saw Petitioner come out of the building holding the handgun and looking directly at Robles.  Robles and the others drove to the police station reporting their belief that Ruiz had been shot.  They returned to the building with

the police, who found Ruiz lying dead in the stairwell, having been shot in the back.

Docket Entry No. 18-8, at 3-4.

On the basis of these events, Petitioner was charged with murder, felony-murder, armed robbery, firearm offenses, as well as lesser-included offenses of these crimes. See id. at 2. The State's case against him relied on statements made by a multitude of witnesses, see Docket Entries Nos. 18-42 to 18-44, but was mainly based upon the  testimony and identifications provided by Robles as well as statements given by two other individuals, Mark Trainor ("Trainor") and Francis Campbell ("Campbell"). Trainor and Campbell briefly shared a Camden County Correctional Facility ("CCCF") prison cell with Petitioner in February 1999.[2] Trainor and Campbell testified that the three shared their life stories, and Petitioner told them about the circumstances of his arrest

---

[2] Trainor and Campbell did not know either each other or Petitioner prior to the short period when the three were housed in the same cell. Trainor was in confinement on contempt of court charges ensuing from his violation of a court order addressing a domestic violence incident, while Campbell was confined on the charges of kidnaping, sexual assault, endangering the welfare of a child and aggravated assault. See Docket Entry No. 18-44, at 8. Petitioner had four adult criminal prosecutions prior to the one challenged in this matter. See Docket Entry No. 1-2, at 5-6 (three prosecutions in 1998 on controlled-substance offenses which yielded a prison term, a monetary fine and a bench warrant and, in addition, a 1999 prosecution on the charges of robbery, aggravated assault and firearm offenses ensuing from the events that took place at a certain bar located in Camden, New Jersey. These 1999 robbery-assault-firearm charges were, seemingly, terminated after Petitioner's prosecution underlying the instant matter got underway).

and the Westfield Acres incident when, being "high on 'wet,'" he "busted loose" and shot someone. Id.[3]

Petitioner pled not guilty, maintaining that he had nothing to do with either Ruiz's death or Robles' robbery. See, generally, Docket Entry No. 18-8, at 2-12. Initially, he filed a notice of alibi. The notice, which was filed by his original counsel – whose actions are not challenged in this matter – asserted that on the date of the incident Petitioner had "injured his ankle" and called his girlfriend, Tawana Williams. Williams then picked Petitioner up and had him driven to her residence where Petitioner "stayed for the remainder of the evening and overnight." Docket Entry No. 1-2, at 7. However, by the time of his trial, Petitioner had elected not to testify or call any witnesses. See Docket Entry No. 18-43, at 85-86 (Petitioner's statements to trial judge that, despite the filing of the notice

---

[3] Generally, the term "[w]et' is a slang term for a cigarette made from a mixture of marijuana and Phencyclidine ('PCP')." United States v. Nesbitt, 418 F. App'x 81, 83 n.1 (3d Cir. 2011). Alternatively, the term "wet" could imply a reference to a non-marijuana solid substance saturated with a PCP-like liquid. See Docket Entry No. 18-8, at 4; accord United States v. Shavers, 693 F.3d 363, 369 (3d Cir. 2012) (allowing for such interpretation). Here, it appears that Petitioner might have been referring to a cigarette made of mint leaves saturated with an embalming fluid, i.e., formaldehyde, which is a psychoactive that affects brain function, resulting in alterations in perception, mood and behavior. See Docket Entry No. 18-43, at 18, 31; http://www.nt.gov.au/health/health dev/health_promotion/bushbook/volume2/chap1/sect1.htm.

of alibi, Petitioner chose neither to testify nor call any witnesses in his defense).

The jury acquitted Petitioner of murder but convicted him of reckless manslaughter, felony-murder, robbery and firearm offenses.  See Docket Entry No. 18-8, at 1.  He was sentenced to "life imprisonment plus fifteen years, with a thirty-five-year parole disqualifier" on the manslaughter and felony-murder charges and a consecutive term of "fifteen years imprisonment, with a five-year parole disqualifier" on the charges of robbery. State v. Downer, 2011 WL 941090, at *1 (N.J. Super. Ct. App. Div. Mar. 21, 2011).

Petitioner challenged both his conviction and sentence on direct appeal, which resulted in a remand as to his sentence but an affirmance of the conviction.  See id. at *2.  The Supreme Court of New Jersey denied certification.  See State v. Downer, 178 N.J. 251 (2003).

Petitioner thereafter filed a series of counseled and pro se post-conviction relief ("PCR") applications asserting a multitude of claims.  The Superior Court of New Jersey, Law Division ("Law Division"), conducted many days of evidentiary hearings and found the challenges to be without merit.  See Downer, 2011 WL 941090, at *2.  His appeal was dismissed by the Appellate Division.  See id. at *6.  After his application for certification was denied by

the New Jersey Supreme Court, <u>see</u> <u>State v. Downer</u>, 208 N.J. 338 (2011), this Petition followed.

## II.     <u>PETITIONER'S CHALLENGES AT BAR</u>

The Petition does not list Petitioner's instant challenges; rather, it refers the Court's attention to the document Petitioner labeled "Addendum II." <u>See</u> Docket Entry No. 1, at 3. The "Addendum II" submission states nine grounds, each of which consists of many sub-claims.[4] <u>See</u> <u>id.</u> at 13-32.

Ground I:       Trial counsel was ineffective for his failure to contact, interview or call Douglas Scott in violation of 6th Amendment compulsory proces[s] for obtaining witnesses in his favor.

Ground II:      Counsel was ineffective for failing to contact, interview and present as witness Deshaun Milton, in violation of 6th Amendment compulsory process for obtaining witnesses in his favor.

Ground III:     Trial counsel was ineffective in the cross examination of State witnesses, Trainor and Cam[p]bell, for repeatedly eliciting prejudicial testimony and for the failure to impeach their inconsistent testimonies.

Ground IV:      Trial counsel was ineffective for his failure to challenge prosecutor's references to [Petitioner's] unrelated arrest as inadmissible and for his failure to impeach State witness Cam[p]bell on his ability to have read about [Petitioner's] unrelated arrest in the newspaper.

Ground V:       Trial counsel was ineffective for his failure to consult a fingerprint expert and revealing ignorance of the subject.

-----

[4] Petitioner's memorandum, submitted jointly with his Petition, recites the same nine  grounds and elaborates on his many claims.  <u>See</u> Docket Entry No. 1-1, at 2-3.

Ground VI:      Trial counsel was ineffective for failing to
                impeach the credibility of State witness Detective
                Kellegan regarding his grand jury testimony, and
                the inaccuracy of the stories he affirmed as true.

Ground VII:     Trial counsel was ineffective [] for his failure
                to prepare for defense and  familiarize himself
                with [Petitioner's] case and relevant facts.

Ground VIII:    The State engaged in prosecution misconduct when
                it introduced other crimes evidence in violation
                of [Rule] 404 (b) and while knowing that portions
                were false, and in failing to correct state
                witness false testimony that he could not have
                read about [Petitioner's] unrelated arrest in the
                newspaper, thus rendering [Petitioner's] trial
                unfair in violation of [the] 14th [A]mend[ment].

Ground IX:      The cumulative effects of trial errors and trial
                counsel's ineffective assistance denied
                [Petitioner] the right to a fair trial and due
                process . . . .

Docket Entry No. 1-1, at 2-3; accord Docket Entry No. 1, at 13-

32.

## III.   **STANDARD APPLICABLE ON § 2254 HABEAS REVIEW**

The general standard of federal habeas review is long-

established.  It sets forth a narrowly-tailored test.  See Cullen

v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("As amended by

AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a

federal court to grant an application for a writ of habeas corpus

on behalf of a state prisoner").  Thus, Section 2254(a) permits a

federal court to entertain only claims alleging that a person is

held in state custody "in violation of the Constitution or laws

or treaties of the United States." 28 U.S.C. § 2254(a).  The

AEDPA further limits a federal court's authority to grant habeas

relief by providing that, when a state court has adjudicated a petitioner's federal claim on the merits, a district court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).

Consequently, the starting point of federal habeas review under a § 2254(d)(1) analysis is to determine the relevant law clearly established by the Supreme Court. <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 660 (2004). A decision is "contrary to" a Supreme Court holding, within the meaning of 28 U.S.C. § 2254(d)(1), if: (a) the state court outright "contradicts the governing law set forth in [the Supreme Court] cases"; or (b) the state court "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." <u>Williams</u>, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529

U.S. at 413. Notably, under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410). Correspondingly, the standard posed by federal habeas review "is difficult to meet, [since it is a] highly deferential standard for evaluating state-court rulings, [and that standard] demands that state-court decisions be given the benefit of the doubt." Cullen, 131 S. Ct. at 1398 (citations and internal quotation marks omitted).

Much of Respondents' answer and Petitioner's traverse are dedicated to the issue of procedural default. Respondents maintain that Petitioner "has procedurally defaulted on [his] Grounds Three, Four, Five, Six, Eight and Nine, as he failed to properly present these issues before the state court as part of his direct appeal and consequently, is now barred from seeking relief based upon state procedural rules." Docket Entry No. 18, at 20.

Respondents' argue the above challenges should be deemed procedurally defaulted because they: (a) were raised during Petitioner's PCR proceedings could have been brought on direct appeal; and/or (b) the state courts dismissed some of these claims without analysis, merely stating that Petitioner's challenges warranted no discussion in a written opinion. See id.

at 21-26.  Respondents' argument, however, is misplaced.  A habeas petitioner must exhaust state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims *either* on direct appeal or in post-conviction proceedings.  See Ross v. Petsock, 868 F.2d 639 (3d Cir. 1989); see also O'Sullivan v. Boerckel, 526 U.S. 838 (1999).  This means that the claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition.  See Picard v. Connor, 404 U.S. 270, 275 (1971).  Where any available procedure remains, even only theoretically, the petitioner cannot be deemed to have exhausted the available state remedies.  See 28 U.S.C. § 2254C.  Thus, district courts are obligated to dismiss habeas petitions containing unexhausted claims, even if it is not likely that a state court will consider the claims on the merits.  See Rose v. Lundy, 455 U.S. 509, 522 (1982); Banks v. Horn, 126 F.3d 206, 212-14 (3d Cir. 1997); see also Toulson v. Beyer, 987 F.2d 984, 989 (3d Cir. 1993).

However, a different analysis applies to those petitions that consist of (or include within themselves) unexhausted challenges with regard to which the petitioner *cannot* obtain state court review.  Section 2254(b)(1)(B)(i) excuses exhaustion where there is "an absence of available State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i); see also Duckworth v.

Serrano, 454 U.S. 1, 3 (1981) (per curiam).  Thus, a habeas petition containing claims that are unexhausted but procedurally barred cannot be dismissed as unexhausted: because the doctrine of procedural default excuses failure to exhaust.  See Toulson, 987 F.2d at 987; accord Coleman v. Thompson, 501 U.S. 722, 730-32 & n.1 (1991); Harris v. Reed, 489 U.S. 255 (1989).  Still, while procedural default excuses exhaustion, it is a double-edged sword, i.e., the doctrine was not created as an incentive for state litigants to circumvent state court review.  Even when petitioner's failure to comply with a state procedural rule has *actually prevented* the state courts from reaching the *merits* of his federal claims, federal habeas review of those claims is ordinarily barred, see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991), "unless the habeas petitioner can show 'cause' for the default and 'prejudice' attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice."  Harris, 489 U.S. at 262 (citations and internal quotation marks omitted); accord Coleman, 501 U.S. at 750; Cabrera v. Barbo, 175 F.3d 307, 312-14 (3d Cir. 1999); McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999). It follows that, once the state courts addressed a certain claim on the merits, a "substantial equivalent" of that claim cannot be deemed procedurally defaulted for the purposes of a Section 2254 action, regardless of whether such state review on merits was

performed on direct appeal or by means of a PCR proceeding.
Accord Coleman, 501 U.S. at 732.

Moreover, a state court may render an adjudication on the
merits of a federal claim by rejecting the claim without any
discussion whatsoever.[5]  Here, not a single claim contained in
Petitioner's Grounds, *if raised* before the state courts, was
dismissed by the state courts with the statement indicating
refusal to review that claim on merits.  Thus, Respondents'
procedural bar argument is facially misplaced.  While some claims
of Petitioner's Grounds were *never raised* before the state
courts, these claims cannot be deemed procedurally barred: being
left unexhausted, they are subject to review under the Court's §
2254(b)(2) mandate.[6]

_____

[5] See Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004),
rev'd on other grounds sub nom, Rompilla v. Beard, 545 U.S. 374
(2005); see also Jenkins v. Superintendent of Laurel Highlands, __
_ F.3d ____, 2013 U.S. App. LEXIS 1004, at *10 (3d Cir. Pa. Jan.
15, 2013).

[6] While a habeas petition containing unexhausted challenges
warranting no excuse of failure to exhaust cannot be *granted*,
"[a]n application for a writ of habeas corpus may be *denied* on
the merits, notwithstanding the failure of the applicant to
exhaust the remedies available in the courts of the State."  28
U.S.C. § 2254(b)(2) (emphasis supplied); see also Lambert v.
Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v.
Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).  In other words, a
facially meritless habeas claim can be dismissed on habeas review
even if it was never exhausted before the state courts during the
direct appeal or PCR proceedings.

12

IV.     **DISCUSSION**

One of Petitioner's nine Grounds challenges matters unrelated to the assistance rendered by his trial counsel.  His remaining eight Grounds address various aspects of his counsel's performance and, in addition, challenge the cumulative effect of his counsel's alleged errors.

A.  **GROUND EIGHT**

Petitioner's Ground Eight focuses on the statements made by his prosecutor.  Some claims within Petitioner's Ground Eight were duly presented to the state courts when Petitioner argued that certain parts of the prosecutor's summation exceeded permissible boundaries of vigorous litigation.  See Docket Entry No. 18-6, at 10-11.  His other Ground Eight claims are unexhausted because he now raises new challenges, claiming that the prosecutor improperly questioned and elicited witness testimony as to how Petitioner was arrested.  See Docket Entry No. 1-1, at 41-42.  This Court will examine the exhausted part of Petitioner's Ground Eight to determine whether the state courts' ruling was not an unreasonable application of Supreme Court precedent, while the unexhausted remainder of Petitioner's Ground Eight will be examined under this Court's § 2254(b)(2) mandate.

1.  **Governing Legal Principles**

In Darden v. Wainwright, 477 U.S. 168, 181(1986), the Supreme Court articulated the test applicable to the claims

asserting prosecutorial misconduct. The Court held that "the
relevant question is whether the prosecutors' comments so
infected the trial with unfairness as to make the resulting
conviction a denial of due process." Id. at 180 (quoting
Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). This analysis
applies to prosecutorial opening statements and summations as
well as to the questions asked by prosecutors. See Marshall v.
Hendricks, 307 F.3d 36, 73 (3d Cir. 2002) (observing that, where
a petitioner "contends that the prosecutor 'deliberately led' [a
witness] to the improper disclosure, and that . . . 'the
prosecutor's entire [line of questioning of that witness] was
aimed at these topics," habeas relief was not warranted unless
the record unambiguously showed that the improper disclosure was
instigated by the prosecutor rather than volunteered by the
witness); see also Schrader v. Fowler, 852 F.2d 569 (6th Cir.
Tenn. 1988) (quoting Goins v. McKeen, 605 F.2d 947 (6th Cir.
1979), for the proposition that a petitioner claiming he was
denied a fair trial because the jury was, in the petitioner's
opinion, left insufficiently "indifferent" as a result of
prosecutorial comments, had to "prove bias not [by] speculation
but [by] demonstrable reality").[7]

---

[7] Prosecutorial "vouching," if it takes place, could qualify
as misconduct for the purposes of habeas review only if "the
prosecuting attorney [vouches for] the credibility of a
Government witness through personal knowledge or by other
information outside of the testimony before the jury." United

The quantum or weight of the evidence is crucial to determining whether the prosecutor's statements before the jury were so prejudicial as to result in a denial of due process. <u>See</u> <u>Darden</u>, 477 U.S. at 182; <u>Donnelly</u>, 416 U.S. at 644; <u>Moore v.</u> <u>Morton</u>, 255 F.3d 95, 111 (3d Cir. 2001).

## 2. <u>Challenges Relying on State Rules of Evidence</u>

Petitioner asserts, <u>inter alia</u>, that some statements made during his trial should not have been allowed under state rules of evidence. However, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable." <u>Engle v. Isaac,</u> 456 U.S. 107, 120 n.19 (1982). In other words, "errors of state law cannot be repackaged as federal errors." <u>Johnson v. Rosemeyer</u>, 117 F.3d 104, 110 (3d Cir. 1997). For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. <u>See</u> <u>Keller v. Larkins</u>, 251 F.3d 408, 413 (3d Cir.), <u>cert.</u>

States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998); <u>see</u> <u>also</u> <u>United States v. Lore</u>, 430 F.3d 190, 211 (3d Cir. 2005). In contrast, where the "prosecutor's statement[s] . . . contained no suggestion that he was relying on information outside the evidence presented at trial [and h]e supported his comment by referring to [the] testimony [offered to the jurors], the prosecutor's remarks cannot be read as" improper vouching. <u>Id.</u>; <u>see</u> <u>also</u> <u>Walker</u>, 155 F.3d at 184 ("[W]here a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury [of] the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching").

<u>denied</u>, 534 U.S. 973 (2001). Because, as set forth below, Petitioner's rights to a fundamentally fair trial were not violated, his claims based on state law fall outside the scope of this Court's habeas review and, thus, cannot warrant habeas relief.

### 3.   <u>Prosecutorial Statements Challenged by Petitioner</u>

As noted <u>supra</u>, upon his arrest and placement in a CCCF cell, Petitioner made his acquaintances with Trainor and Campbell and told them about the events underlying his current conviction. Presenting Trainor and Campbell's testimonies to Petitioner's jurors, the prosecutor had to establish the rather unique circumstances under which Petitioner met Trainor and Campbell and uttered his statements.  In other words, the prosecutor had to explain how Petitioner landed in the CCCF cell, why he had the time and reasons to interact with Trainor and Campbell, and why it was plausible for him to disclose details of his past to these two men.  Correspondingly, as to Trainor, the following questions were asked:

Prosecutor:     Now, during the time you were in the cell with
                [Petitioner] and . . . Campbell, what -- what did
                you guys do?

Trainor:        Besides the normal play cards, sleep, wake, sleep,
                eat and what have you, you know, conversations
                about how we all got here.  War stories I guess
                you would call it.  And more . . . or less found
                out about one another.  Why we were here.

                . . .

16

| | |
|---|---|
| Prosecutor: | Now, did [Petitioner] participate in this discussion? |
| Trainor: | Yes, he did. |
| Prosecutor: | Okay. And did he tell you how he ended up in the cell with you?  How he got – ended up getting . . . arrested? |
| Trainor: | He was ah, arrested – |
| Prosecutor: | *Well, don't* – Take it a step at a time. |
| Trainor: | Okay. |
| Prosecutor: | Did he tell you how he got arrested? |
| Trainor: | Ah he – |
| Prosecutor: | Just – just answer . . . [y]es or no. |
| Trainor: | Yes. |
| | . . . |
| Prosecutor: | Now, did he – did he tell you where the arrest took place? |
| Trainor: | Ah, yes. |
| Prosecutor: | *And where did he say the arrest took place*? |
| Trainor: | *Ah, it was in a bar*. |
| Prosecutor: | Okay.  And did he describe who arrested him? |
| Trainor: | Yes. |
| Prosecutor: | And what was that? |
| Trainor: | That was like a SWAT team or something to that effect. |
| | . . . |
| Prosecutor: | Did he tell you he committed any crimes? |
| Trainor: | Ah, in his statement, yes. |

| Prosecutor: | Okay. Now, I want you to tell us whether he described the crime that occurred in the stairwell? |
|---|---|
| Trainor: | Yes, he did.  . . .[I]t was in a conversation where we're exchanging how we all got there where he was in a stairwell and I believe it was Westfield or Westfield Gardens where he was waiting for an individual that owned (sic) him money.  He referred to him in a derogatory ethnic slur, quote, unquote, "spic." He was waiting for him.  When he arrived he used the metaphor, "busted loose on him." |

Docket Entry No. 18-43, at 16-17 (the italicized text reflects

the emphases supplied by Petitioner in his memorandum, Docket

Entry No. 1-1, at 45, filed in support of his Petition).

Campbell's line of questions and answers included, <u>inter</u>

<u>alia</u>, the following:

| Prosecutor: | And how many people were in the cell? |
|---|---|
| Campbell: | Three [of us]. |
| Prosecutor: | Now, when the three of you were in the cell together, what -- what did you do? |
| Campbell: | Um, primarily – lot of it was a lot of sleep and – and did a lot of talking. |
| Prosecutor: | Okay.  Now, did [Petitioner] describe to you how he ended up being . . . incarcerated? |
| Campbell: | Yes. |
| Prosecutor: | And did he tell you where he was arrested? |
| Campbell: | Yes, he did. |
| Prosecutor: | Where did he say he was arrested? |
| Campbell: | He was arrested in a bar or a night club in the Fairview Section . . . of Camden. |

| | |
|---|---|
| Prosecutor: | And did he say who arrested him? . . . Well, no. *Well, no don't* – I just want to know who arrested him? |
| Campbell: | Oh, the police. |
| Prosecutor: | *Did he say how many officers or what kind?* |
| Campbell: | *He said it looked like a SWAT Team running down on him.* |
| Prosecutor: | Now, did he describe to you any criminal conduct that he engaged in? |
| Campbell: | Yes. |
| Prosecutor: | And I want to direct your attention, most particularly, to a shooting. Did he describe a shooting to you? |
| Campbell: | He described – oh, a shoot – shooting, yes. |
| Prosecutor: | Okay. Now, I want you to tell us what he said about the shooting? |
| Campbell: | Um, it started off where he was -- he was . . . explaining to me how he was high on wet. He [saw] a gentleman [who] owed him some money. They went into a stairwell and ah, started talking. At that point in time, um, something . . . incurred and he just started busting off at him. . . . |
| Prosecutor: | Now, did he say . . . where . . . he busted off on him? |
| Campbell: | It was in um, I can't remember the name of it. It was off Westfield Acres. I mean, Westfield Avenue. [I] think it's the Westfield Acres, I believe the name of it is. |

Id. at 29-30 (the italicized text reflects the emphases supplied

by Petitioner in his memorandum, Docket Entry No. 1-1, at 43).

Then, in light of Petitioner's theory of the case (which

maintained, inter alia, that Campbell obtained all information

19

about Petitioner's involvement in Ruiz's death, not from
Campbell's interactions with Petitioner but from a certain
newspaper article),[8] the prosecutor asked Campbell additional
questions establishing that: (a) the information, to which
Campbell testified, was obtained from Petitioner first-hand, and
its scope well exceeded the limited information disclosed in the
newspaper article; and (b) Campbell used the newspaper article
not as a source of his information about Petitioner's crime but
as a "lead" enabling Campbell to contact the prosecutors.  The
following testimony ensued:

Prosecutor:     Now, once [Petitioner] told you [about the events
                that took place at Westfield Acres], what [did]
                you make of it?

Campbell:       I really didn't make anything of it.  I mean, it
                is a jail.  Some people do –  do blow up what

---

[8] Campbell conceded to reading that newspaper article.
Capitalizing on Campbell's admission, Petitioner's counsel
offered the jurors Petitioner's position, which was as follows:

> Now, Mr. Campbell comes in . . . .  he admits on the stand
> that [after coming in contact with Petitioner,] he reads a
> newspaper article and a newspaper article mentions
> [Petitioner's] name and mentions the details of his arrest.
> Mentions the fact of where this happened.  . . .  Mentions
> the theory behind the case.  Mentions a shooting.  And I
> asked Mr. Campbell on the stand, isn't it true that
> basically everything you have set forth in your letter
> [that you wrote to Petitioner's prosecutor about the
> information you obtained from Petitioner,] everything that
> you said here today is what could be found in [that]
> newspaper article.  And he says, yes, that's true.

Docket Entry No. 18-44, at 9.

|              | they're in there for.  So I didn't really think anything of it.  I just let it be. |
|--------------|------|

Prosecutor:      Okay.  Did anything happen to change your mind?

Campbell:      Ah, a couple days later we finally get shipped out . . . and ah, I just happened – I did pick up a newspaper.  I did read it and everything clicked together, what was . . . told to me [by Petitioner].

      . . .

Prosecutor:      And is that the article . . . you said it made you think differently about what he told you?

Campbell:      Correct.

Prosecutor:      What did you do once you saw the article?

Campbell:      At that point in time I actually wrote a letter to the Prosecutor's Office stating that I might have some information for them on [Petitioner].  I actually wrote it to Miss Albright, if I ain't wrong.

Prosecutor:      And why did you write to her. . . -- of all people?

Campbell:      . . . I just noticed in [the article who] was the person handling the case . . . at the time.

Prosecutor:      Okay. Was her name in the article? Is that what you're saying?

Campbell:      Yes.

Prosecutor:      Now, was there anything in the newspaper *that you have in front of you* about <u>how</u> [Petitioner] ended up in the jail?  How he got arrested? . . .

Campbell:      No, there isn't.

      . . .

Prosecutor:      Now, has the Prosecutor's Office given you anything or promised you anything in exchange for

that statement . . . that you gave? Or for your
                    testimony here today?

Campbell:        No, they did not.

Id. at 32-33 (the italicized text reflects the emphasis supplied

by Petitioner in his memorandum, Docket Entry No. 1-1, at 45;

emphasis by underlining supplied by

the Court).[9]

     At the close of Petitioner's case, the defense counsel

prompted the jurors to find that Trainor and Campbell (whom

Petitioner's counsel defined as "two snitches," "two rats" and

"two story tellers") must have manufactured their testimonies

about the statements Petitioner made to them at the CCCF cell.

Petitioner's counsel opined that such conclusion was warranted

because Campbell read the newspaper article and it would have

"made no sense" for Petitioner to disclose such self-

incriminating information to his cell mates.

     In response, the prosecutor argued in summation,

     What did [Petitioner] tell these [Trainor and Campbell?]
     Basically, he told them he shot a man in the stairway of
     Westfield Acres.  He did not tell them whether the man lived
     or died.  And he did not tell them it was a robbery.

     Now, you recall . . . the paper told . . . it was a robbery.
     If Campbell's going to mold his story on a newspaper
     article, . . . you would think he said, yeah, he told me he

_____

     [9] On cross-examination by Petitioner's counsel, Campbell
testified that he asked the prosecutors in Petitioner's case to
assist him with obtaining bail reduction in his own criminal
matter, but he did not succeed in getting any assistance.  See
Docket Entry No. 18-43, at 38-39.

                              22

robbed a guy and he shot him in the back like it said in the newspaper. But he didn't say that. . . . [If Campbell's] story [were] based on the newspaper, [it] would conform to the newspaper.

Now, we know that [Petitioner] told his story to Campbell and Trainor [and] he also described to them how he got arrested. How he . . . was in a bar and all of sudden the SWAT Team came there and got him. Well, I think . . . it was probably more like one officer came in and got him but in order to, you know, be a big man, he told them it was a SWAT Team. And just think about this, ladies and gentlemen[:] . . . *you get arrested*. You're put into a lockdown. You in with two other guys you don't know anything about you . . . except the fact that . . . you're in a jail cell. What are you going to talk about? What's the first thing that's going to come up? Is it going to be what's playing over at the Kimble (sic) Center? No. *It's going to be what you're there for* . . . what brings you together. That's your bond. . . . *Don't you think that is the utmost primary thing on any of these guy's minds is why they're in jail?* . . .

So of course they're going to talk about that. *And what they told . . . about him b[e]ing arrested, they didn't see that in the paper*. *So obviously* [Petitioner] *was flapping his gums* [telling all these additional details].

Now, [Petitioner] argues to you ["]Well, wouldn't that be stupid?["] Well, ladies and gentlemen, criminals don't have to be smart. They . . . flap their gums all the time. They confess all the time. . . .

The information that Campbell and Trainor had, [it] had to come from [Petitioner]. . . . [T]hink about what their situation was.

They're in this jail cell with [Petitioner] and he's telling them how he busted loose on a guy basically because he had a beef with him. They don't really know any real details except, you know, it happened by Westfield Acres in a stairwell. They don't know when it happened. They don't know who the victim was. They don't know whether the victim's dead or alive. They really don't know why it happened. . . . You think that maybe when Francis Campbell did see the paper and he says, wait a minute. . . . Holy -- wow. You know, this guy's serious. He -- he actually did it.

Docket Entry No. 18-44, at 20-22 (the italicized text reflects the emphases supplied by Petitioner in his memorandum, Docket Entry No. 1-1, at 46).

Petitioner challenges the above-quoted prosecutorial summation and questions, as well as the witnesses' elicited testimonies. Petitioner: (a) speculates that the jurors could have been unduly inflamed and confused by these statements,[10] and Campbell and Trainor's credibility might have been unduly bolstered;[11] and (b) maintains that the jury might have had such reaction because Petitioner is concerned that the jurors did not

---

[10] To the extent Petitioner asserts that the prosecutor's comments or the witnesses' testimony introduced unduly inflammatory evidence, this assertion warrants little discussion. Admission of relevant probative evidence cannot violate due process guarantees simply because the defendant fears that this evidence might have a prejudicial effect. See, e.g., Estelle v. McGuire, 502 U.S. 62, 70 (1991) (holding that the state court's admission in petitioner's trial for murdering his infant daughter of the testimony of two physicians that the child had suffered child abuse (evidence of rectal tearing that was six weeks old and rib fractures that were seven weeks old); cf. Rivera v. Illinois, 129 S. Ct. 1446, 1454 (2009) ("The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial") (citation and internal quotation marks omitted). Here, the information offered to the jury was not inflammatory.

[11] For the reasons not entirely clear to this Court, Petitioner also included in his Ground Eight a challenge to the statement made by Campbell to the police, even though that statement was not introduced into evidence during his trial. Since the jurors did not get to know about that statement and, thus, could not have factored it into their analysis, Petitioner cannot challenge his conviction on the basis of that statement: this challenge falls outside the scope of habeas review.

understand that his arrest was performed by police rather than a SWAT team.  See Docket Entry No. 1-2, at 41-47 (detailing the same).

### 3.   Conclusions Made by the State Courts

Dismissing the part of Petitioner's Ground Eight presented for its review, the Appellate Division ruled:

> We reject [Petitioner's] contention that [the prosecutor's statements] focused the jury's attention on the absence of any testimony by [Petitioner] about why [his] cell mates would fabricate their testimony.  This was a response to the theme of the defense, effectuated through strong cross-examination of Trainor and Campbell and forceful and repeated comments in defense summation suggesting that the stories told by the two were illogical and were made up in an effort to gain some self-advantage.  . . .

> [Petitioner] further points to the prosecutor's comment . . . that it is not unusual that cell mates would discuss the circumstances leading to their incarceration and other criminal activity they engaged in.  . . . [T]he prosecutor referred to the contrary argument by the defense: "Now, the defendant argues to you. Well, wouldn't that be stupid?" [Petitioner] argues that by characterizing the defense argument as "stupid," "the prosecutor necessarily caused the jury to again note that [Petitioner] [h]ad not actually testified."  We do not agree. . . .

> [I]t is plain that this was a proper argument in response to a defense argument . . . .  The prosecutor was not calling [Petitioner] stupid and was not suggesting to the jury that [Petitioner] should have testified to . . . why the argument presented by his attorney was not stupid.  [The prosecutor] was making an appropriate argument, based on the evidence, that it is plausible that someone in [Petitioner's] situation would reveal to his stranger cell mates his prior criminal acts. . . . We find no impropriety in the prosecutor's comments.

Docket Entry No. 18-8, at 5-8.

### 4.   Petitioner's Ground Eight Merits No Habeas Relief

The above-quoted state court's findings were not an unreasonable application of Supreme Court precedent. It is proper for a prosecutor to rebut the evidence and arguments made by defense counsel.[12]  See United States v. Robinson, 485 U.S. 25, 33 (1988). Here, Petitioner's theory of the case was built on the theory that it would have been unnatural for Petitioner to confide in his cell-mates, and Campbell's testimony must have been a clever paraphrasing on the information offered by the newspaper article rather than a recital of the first-hand information Campbell obtained directly from Petitioner. Therefore, it was appropriate for the prosecutor to provide the jury with evidence of Campbell and Trainor's knowledge beyond the scope of that newspaper article. That additional information included the circumstances of Petitioner's arrest, and so it was properly offered to supply the background to Trainor and Campbell's testimonies.

The record indicates the prosecutor's care in limiting the information testified to the context of the conversations

---

[12] See United States v. Sylvester, 365 F. App'x 379, 380-81 (3d Cir. 2010):

> In Griffin v. California, the Supreme Court held that the Fifth Amendment bars the prosecution from commenting, directly or indirectly, on a defendant's silence. 380 U.S. 609, 615 (1965). . . . [However] "when the defendant uses his Griffin protection as a sword, rather than a shield, the prosecution may respond appropriately." [United States v.] Isaac, 134 F.3d [199,] 206 (3d Cir. 1998)].

Petitioner had with Trainor and Campbell. Hence, no prosecutorial misconduct had occurred. See Marshall, 307 F.3d at 73. Furthermore, the prosecutor's questions and resulting testimonies did not infect the trial with unfairness so as to make Petitioner's resulting conviction a denial of due process. See Darden, 477 U.S. at 181; Donnelly, 416 U.S. 637. This Court agrees with the state courts that none of the challenged language came even close to raising due process concerns: the value of Trainor and Campbell's testimonies was neither unduly amplified nor vouched for by the prosecutor; and these testimonies caused no confusion or undue bias. Petitioner presents no valid challenge.[13] Thus, his Ground Eight claims will be dismissed.

## B.  GROUNDS ASSERTING INEFFECTIVE ASSISTANCE OF COUNSEL

### 1.  Governing Legal Principles

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is

---

[13] Petitioner's position that the jurors might have been rendered unduly "inflamed" by the testimony about Petitioner's bragging to Trainor and Campbell that Petitioner was arrested by a SWAT team is meritless, since both witnesses *testified that Petitioner was arrested by police officers*, although the officers "ran" akin to a SWAT team, or that the process of the arrest looked "like" a SWAT team or "something to that effect." Indeed, even the prosecutor himself stressed to the jurors that any Petitioner's reference to a "SWAT Team" must have been an exaggeration.

the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.[14]  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.  See id.  To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability

---

[14]  See also Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.[15]

## 2. Groups of Claims Consolidated into Grounds Three and Four

### a. Aspects Building on the Challenges Raised in Ground Eight

Some of Petitioner's claims raised in his Grounds Three and Four include challenges that build on his claims asserted in Ground Eight, examined supra.

#### i. *Challenged Counsel's Question and Campbell's Response*

Specifically, Petitioner challenges the following part of Campbell's cross-examination:

| Defense counsel: | In the statement [Petitioner] gave you he said he was waiting in the hallway or stairwell, correct? |
|---|---|
| Campbell: | No, they were outside. |
| Defense counsel: | . . . So, in a statement [Petitioner] gives you, he was outside? |
| Campbell: | They were standing outside and he seen the [murder victim. Then] they went into the stairwell to talk. |

. . .

---

[15] The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

| | |
|---|---|
| Defense counsel: | Did [Petitioner] tell you that he was waiting for this [murder victim] in the <u>hallway</u>? |
| Campbell: | No, he didn't. |
| Defense counsel: | Did [Petitioner] tell you that he was waiting for this [murder victim] in the <u>stairway</u>? |
| Campbell: | No. |
| Defense counsel: | Did [Petitioner] tell you that he was waiting for this [murder victim] because he owed him money? |
| Campbell: | He just said he's standing <u>outside</u> and he seen the [murder victim who] owed him money and went in the <u>stairwell</u> to talk. |
| Defense counsel: | So he went into the <u>stairwell</u> to talk with this [murder victim]? |
| Campbell: | Correct. |
| | . . . |
| Defense counsel: | Did [Petitioner] tell you if he got his money back from that [murder victim]? |
| Campbell: | I guess he didn't if he shot him. I don't know. |
| Defense counsel: | You guess he did or guess he didn't? |
| Campbell: | . . . I mean, all I know is he shot the man. |
| Defense counsel: | *Did he tell you where he shot him?* |
| Campbell: | *The guy was turned around. I believe it was in his back. They guy was trying to get away from him when he pulled the gun out.* |
| Defense counsel: | And did [Petitioner] mention if the [murder victim] had anyone else there with him? |

30

| | |
|---|---|
| Campbell: | No, he didn't. |
| | . . . |
| Defense counsel: | [Petitioner] didn't tell you . . . that [Petitioner] follows the [murder victim] *into the building*, did he? |
| Campbell: | Like [I] said, . . . they were *outside* and they went *inside* to talk so if they went *inside* to talk, of course . . . they went *into the building* together. |
| Defense counsel: | Okay. And in the statement [Petitioner] gave to you, it was just [Petitioner] and the victim *inside* the building, correct? |
| Campbell: | That is correct. |

Docket Entry No. 18-43, at 43-45.

Focusing on the italicized text, Petitioner maintains that his counsel made the "greatest blunder" when he asked Campbell "where" Ruiz was shot. Apparently, Petitioner believes that Campbell could not have known that Ruiz was shot in the back (simply because Petitioner was not aware of any "record showing [that] Campbell knew that information") and so Petitioner believes that, initially, the fact of Ruiz being shot in the back "was [somehow] not part of the [S]tate's case."[16] See Docket

---

[16] The logic of Petitioner's position is not immediately obvious to this Court. Since the fact that Ruiz was shot in the back was not in the newspaper article that Campbell read, the only way Campbell could testify to that fact without obtaining that information from Petitioner during their CCCF conversations was if the prosecutor disclosed that information to Campbell. However, if the Court were to presume that the prosecutor actually conveyed that information to Campbell, it is self-evident that the State's case had to be built on that information

31

Entry No. 1-1, at 25-26. Petitioner, thus, maintains that his
defense counsel committed an error of constitutional magnitude
when the counsel asked the question and did not "force [Campbell]
to say where he got this information." Id. at 25.

Petitioner's position is without merit.  Counsel's questions
as to "where" Ruiz was shot focused, invariably, on the
geographic locale of the shooting (i.e., on the issue of whether
it took place outside the building or inside it, on a stairwell
or in a hallway, within or out of Robles' sight/presence, etc.).
These questions were designed: (a) to highlight the minor
inconsistencies between Robles and Campbell's accounts; and (b)
to suggest that Ruiz was shot, not by Petitioner but by someone
else.  See Docket Entry No. 18-44, at 2-4 ( Petitioner's
counsel's summation stating, inter alia, "there's certain parts
of the State's case that I agree with.  I do agree that there was
a shooting, a robbery and a resulting death . . . .  And I agree
that . . . both victims[] went there with the intent to purchase
marijuana.  And I agree that at one point the parties separated.
And the decedent went upstairs. . . .  I agree to all that.
Where [the State and I] differ is whether or not [Petitioner] had

---

ab initio. Granted that: (a) the fact of Ruiz being shot in the
back was determined immediately upon Ruiz's death, since the
moment Robles arrived to Westfield Acres with police; and (b) the
fact was stipulated to by all sides and never litigated,
Petitioner's position that the fact was not built into the
prosecutor's case appears even more inexplicable.

anything to do with the events of that night"). The above-quoted
excerpt shows that Campbell's statement as to Ruiz being shot in
the back was volunteered by Campbell without even a prompt on
defense counsel's part. Moreover, the fact that Campbell did not
make a pre-trial statement reflecting his knowledge about the
part of the body where Ruiz was shot by no means establishes that
Campbell did not obtain that information from Petitioner.[17]

Furthermore, the testimony demonstrates that Campbell's
position was that <u>all</u> information about Ruiz's death, about which
he testified, he learned from Petitioner during the time they
shared the CCCF cell.

Therefore, Petitioner's counsel's elections to ask questions
about the geographic locale of the shooting and to go no further
with the questioning were sound strategic choices not amenable to
second-guessing on habeas review. <u>See</u> <u>Strickland</u>, 466 U.S. at
689 ("Because of the difficulties inherent in making the
evaluation, a court must indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable
professional assistance; that is, the defendant must overcome the
presumption that, under the circumstances, the challenged action
might be considered sound trial strategy"); <u>Thomas v. Varner</u>, 428
F. 3d 491, 499 (3d Cir. 2005) ("To overcome the <u>Strickland</u>

--------

[17] In the same vein, the minor discrepancy between Campbell
and Trainor's recollections cannot establish that Campbell must
have been unaware about the part of the body Ruiz was shot.

presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy"). Correspondingly, this Petitioner's line of attacks on his counsel's strategic elections fails to meet the first prong of the <u>Strickland</u> test and cannot warrant habeas relief. It will be dismissed pursuant to this Court's § 2254(b)(2) mandate.

### ii. *Claims Building on Prosecutorial References to Arrest*

As detailed <u>supra</u>, Petitioner's Ground Eight attacks the prosecutorial references to Petitioner's arrest. Maintaining that his arrest was wholly irrelevant to the events that resulted in his conviction, Petitioner re-asserts – this time in his Ground Four – that introduction of the fact of his arrest unduly bolstered Trainor and Campbell's credibility by providing the needed context to their testimonies (as to how Petitioner came about to tell them of shooting Ruiz when the three men were in the same CCCF cell). <u>See</u> Docket Entry No. 1-1, at 29-30. In addition, Petitioner maintains that Campbell committed perjury when he denied reading about Petitioner's arrest in the newspaper. <u>See</u> <u>id.</u> at 31. Paraphrasing these two lines of challenges into the claims now attacking his counsel's

performance, Petitioner maintains that he is entitled to habeas relief because his counsel should have objected "more" to prosecutorial references to Petitioner's arrest and, in addition, should have accused Campbell of perjury.[18]  See id. at 29-31.

Petitioner's claims are without merit.  While Petitioner would prefer to have all the context (of how and why Campbell and Trainor came to obtain the information about Ruiz's death), so the jurors would have been left to wonder as to the extent and duration of Petitioner's relationship with Trainor and Campbell. See Docket Entry No. 1-1, at 29 (expressly stating Petitioner's displeasure with the prosecutor establishing a proper foundation

---

[18] The record shows that, upon the prosecutor's first reference to Petitioner's arrest, Petitioner's counsel indeed made an objection:

| Prosecutor: | Now, did [Petitioner] participate in this discussion [of past events that the three of you had while locked in the same CCCF cell]? |
|---|---|
| Campbell: | Yes, he did. |
| Prosecutor: | . . . [D]id he tell you how he ended up in the cell with you? How he got -- ended up getting -- |
| Campbell: | Ah — . . . . He was ah, arrested -- |
| Prosecutor: | Well, don't -- |
| Defense counsel: | Objection. |
| Prosecutor: | Take it a step at a time. |
| Campbell: | Okay. |

Docket Entry No. 18-43, at 16-17.

for the State's position).  The fact and circumstances of Petitioner's arrest and his placement in the CCCF cell with Trainor and Campbell were highly relevant evidence, which admission triggered no habeas concerns.

Moreover, it would be wholly futile for Petitioner's counsel to keep objecting to admission of this evidence after the first objection yielded no advantage to Petitioner.  It was a sound strategy on the part of counsel.[19]  See Strickland, 466 U.S. at 689; Thomas, 428 F. 3d at 499.

Furthermore, Petitioner's position that Campbell perjured himself when he asserted that he did not read about the fact of Petitioner's arrest in the newspaper is contrary to the record.

| | |
|---|---|
| Defense Counsel: | Okay. You didn't write a letter [to Petitioner's prosecutors] until some five days after you read this newspaper article, correct? |
| Campbell: | Correct. |
| Defense Counsel: | You read this newspaper article, you see what [Petitioner has] been charged with and you think to yourself, that's the guy who I was in the pod with, correct? |
| Campbell: | Correct. |
| | . . . |
| Defense Counsel: | Okay. When did you [decide to contact Petitioner's prosecutor]? |

---

[19] See United States v. Cornell, 2008 U.S. Dist. LEXIS 61154, at *18 and n.4 (N.D. Ohio July 25, 2008) (relying on United States v. Jameson, 869 F.2d 1494 (6th Cir. 1989).

Campbell:            When I [saw] there was nobody to help me
                     to get my bail together.

                                . . .

Defense Counsel:     And you thought that by helping out the
                     Prosecutor's Office, that might help you
                     with your bail?

Campbell:            That's correct.

                                . . .

Defense Counsel:     So you had some sort of staked interest
                     in this, didn't you, at that time?

Campbell:            Correct.

Defense Counsel:     And your interest was, if you give them
                     the information that [they] need, your
                     bail will get reduced, you'll get out of
                     jail . . . correct?

Campbell:            That's correct.

Defense Counsel:     And you knew what they wanted to hear,
                     correct?

Campbell:            I didn't know exactly what they wanted
                     to hear but --

Defense Counsel:     You read the newspaper article, didn't
                     you?

Campbell:            Correct.

Defense Counsel:     And you saw what the newspaper article
                     said, correct?

                                . . .

Defense Counsel:     Do you recognize these two letters, sir?

Campbell:            Yes, I do.

                                . . .

Defense Counsel:     And do you recall writing these letters?

| Campbell: | Yes, I do. |
|---|---|
| Defense Counsel: | . . . [W]ould it be fair to say that there is nothing in the way - - in these letters that is not mentioned in this article? |
| Campbell: | That's correct. |
| Defense counsel: | So anything that's set forth in these letters that you give to the Prosecutor's Office, in an attempt to get your bail reduced, is nothing more than was set forth in this same newspaper article that you read some five days before, correct? |
| Campbell: | Correct but I had additional information of _how_ [Petitioner] was arrested and all. I mean . . . you don't read that in the newspaper, sir. That's wasn't in there -- _how_ he was arrested wasn't in the newspaper. |
| Defense counsel: | _How_ he was arrested was not in the newspaper? |
| Campbell: | No. |

Docket Entry No. 18-43, at 37-38 emphasis supplied.

As set forth above, the prosecutor's bid for Campbell's credibility was based on Campbell's information about the _circumstances_ – rather than about the fact – of Petitioner's arrest. The _fact_ of that arrest was in the newspaper, and Campbell acknowledged so under oath. A counsel's election to avoid making what would have appeared to be a baseless perjury accusation cannot violate either prong of _Strickland_. Thus, the state courts' dismissal of this line of challenges was not an unreasonable application of Supreme Court precedent.

### b.    Allegations of "Insufficient Impeachment"

Petitioner's Ground Three also asserts a challenge based on another question asked by the defense counsel and the resulting testimony by Campbell.  Specifically, Petitioner challenges the following exchange:

Defense counsel:    Well, here's an individual just tells you that he shot someone. Did you feel scared?

Campbell:           Yeah.  It does scare you.  You're in -- you're in there with a -- you know, a murderer.

Docket Entry No. 1-1, at 27.

Qualifying this exchange as his counsel's "another . . . blunder" (and Campbell's response as a "damaging testimony"), Petitioner asserts that he is entitled to habeas relief because: (a) his counsel should not have asked that question; and (b) his counsel should have "capitalize[d]" on Campbell's answer by asserting that it contradicted Campbell's other trial testimony and statement to the police.  See id. (quoting Campbell's statement to police, allegedly reading, "The way [Petitioner] was indicating to me and . . . Trainor was he was laughing about it; he thought the whole thing was really funny so *I didn't make anything of it* when he was explaining the situation to us.  *I believed that he was just talking about, maybe robberies... and I didn't think anything else of it*" and deducing from this quote that Campbell's statement was "not intellectually reconcilable"

with the quoted above testimony" (emphasis supplied by Petitioner).

Petitioner's position is without merit. During Campbell's direct examination, the jurors were presented with testimony which was substantively identical to the statement Campbell had given to police.[20] Hence, if there were any contradictions in his statements, the jurors were indeed able to take notice of these contradictions and to assess Campbell's credibility accordingly.

The jurors were also presented with Campbell's account about his initial vague concerns as to the gravity of Petitioner's statement, and the mental transition Campbell experienced when his initial concerns became a certainty after he read the newspaper.[21] Thus, the "intellectually irreconcilable" contradiction Petitioner is asserting was simply not present.[22]

---

[20] See Docket Entry No. 18-43, at 32 ("[Prosecutor:] What was [Petitioner's] attitude as he was describing [his shooting of Ruiz]?" "[Campbell:] Like if we were sitting at a comedy show . . . .-- it was just funny to him how it all went down." . . . "[Prosecutor:] Now, once - - once he told you this, what did you make of it?" "[Campbell:] I really didn't make anything of it. I mean, it is a jail. Some people do -- do blow up what they're in there for. So I didn't really think anything of it. I just let it be").

[21] See Docket Entry No. 18-43, at 32 ("[Prosecutor:] Did anything happen to change your mind?" "[Campbell:] . . . I did pick up a newspaper. I did read it and everything clicked together . . . ." "[Prosecutor:] . . . [T]he article . . . made you think differently about what [Petitioner] told you?" "[Campbell:] Correct").

[22] See Docket Entry No. 18-44, at 22 (the prosecutor's summation, stating, "[Initially, Trainor and Campbell] don't know

Moreover, while Petitioner maintains that his trial counsel

---

. . . . [But] when . . . Campbell . . . see[s] the paper . . . he
says [to himself], wait a minute. . . . Holy -- wow. You know,
this guy's serious. He -- he actually did it"); <u>see</u> <u>also</u> <u>See</u>
Docket Entry 18-43, at 23-50, reflecting Trainor's testimony:

Defense counsel: . . . An individual supposedly confesses to
this murder. . . . Someone confesses a murder to you and you
don't [immediately] go tell the authorities about it.

Trainor:                 Anybody can say anything. At that point
                         – when you're locked up - sir, put
                         yourself in my . . . situation. . . .

Defense counsel:         Someone confesses a murder to you, a
                         homicide . . . [a]n execution, almost, .
                         . . and you don't tell the authorities
                         about it?

Trainor:                 I didn't feel that it was in my best
                         interest [to talk to the authorities] at
                         that point [in time]. . . . This [was]
                         the first time someone ever made a
                         statement that they were involved in a
                         murder. . . . I didn't want to
                         proliferate the situation there. . . . I
                         closed everything at that point. . . .

Defense counsel:         Were you scared?

Trainor:                 Put yourself in my place? . . . I was
                         concerned – highly concerned. For my
                         own safety.

Defense counsel:         So you were afraid? You were in fear? .
                         . .

Trainor:                 At that time, the repercussions that
                         could come out of it . . . if I said
                         anything.

did not try to highlight the weaknesses in Trainor and Campbell's positions, the record unambiguously shows otherwise.[23] While Petitioner believes he could have fared better had his counsel kept reiterating the same point, the amount of Petitioner's counsel's cross-examination and its tenor were valid strategic choices. See, e.g., Hall v. United States, 2004 U.S. Dist. LEXIS 17089, at *58 (N.D. Tex. Aug. 24, 2004) ("This Court finds that defense attorney . . . made a reasonable strategic decision" when the attorney "had determined that [asking more of the same type of questions] would destroy the mood and tempo of the cross-examination and would risk alienating the jury by 'beating a dead horse'"); cf. Davidson v. United States, 2012 U.S. Dist. LEXIS 126130, at *9 (N.D. W. Va. Sept. 6, 2012) ("counsel's decision not to beat a dead horse on an issue [already presented a few times over cannot state] a claim of ineffective assistance of counsel"). The state courts' dismissal of this line of Petitioner's challenges was not an unreasonable application of Supreme Court precedent.

---

[23] See Docket Entry 18-43, at 28 (Trainor's cross-examination, reading, "[Defense counsel:] So you were afraid? You were in fear? . . . Did you ask to be put on protective custody?" "[Trainor:] No." "[Defense counsel:] Did you ask to be moved?" "[Trainor:] No." "[Defense counsel:] Did you ask to speak to a counselor, social worker or any of the guards?" "[Trainor:] No"); see also id. at 42 (Campbell's cross-examination, reading, "[Defense counsel:]Did you feel scared? . . . Did you contact the CO to ask to be put in protective custody?" "[Campbell:] . . . no").

### c. Allegations of Based on Reference to Another Rifle

Finally, as part of his Ground Three and Four challenges, Petitioner maintains that Trainor's cross-examination by Petitioner's counsel's resulted in the counsel's "bizarre tirade that displayed complete lack of forethought." Docket Entry No. 1-1, at 24. The part of the transcript Petitioner seemingly refers to reads as follows:

| | |
|---|---|
| Defense counsel: | According to your statement [given to the State's investigators], this [incident] happened because [Petitioner] was waiting for this [murder victim], correct? |
| Trainor: | That is correct. |
| Defense counsel: | And he was waiting for this [murder victim] because this [murder victim] owed [Petitioner] money, correct? . . . [W]hen you were asked regarding the <u>type of gun that was used</u>, you mentioned a Russian handgun of some sort? |
| Trainor: | No. [Petitioner] referred [to that gun] in a roundtable [Petitioner, Campbell and Trainor were having while locked in the CCCF cell] and it wasn't a connected [to the crime at issue] statement, [Petitioner referred to] an . . . .SKS which is 7.62 Russian carbon.[24] That's |

---

[24] The transcript appears to contain a typographic error, since an SKS is a "carb<u>ine</u>," not a "carb<u>on</u>." A carbine is a long-arm rifle, similar to a musket. The length of any SKS rifle exceeds 40 inches. <u>See</u> <<http://pdf.textfiles.com/manuals/MILITARY/united_states_army_tc_9-56%20-%201_october_1969.pdf>>. An SKS is used with 7.62x39 caliber ammunition. Ruiz, however, was shot with .38 bullet, and Robles testified that Petitioner: (a) used a "handgun" in order to rob him; and (b) ran out of the building, after Ruiz got shot,

|                    | one of the . . . weapons that he did have. |
|--------------------|--------------------------------------------|
| Defense counsel:   | Did he ever mention to you what type of weapon was used in [Ruiz' murder]? |
| Trainor:           | No, he did not.                            |

Docket Entry No. 18-43, at 27 (emphasis supplied).

Notably, Petitioner does not dispute the correctness of Trainor's testimony as to the fact of Petitioner's being in constant possession of that illegally obtained SKS. Rather, Petitioner maintains that the defense counsel's "introduction of the SKS [was] gross negligence [because n]othing was gained by mentioning the SKS [,] it only made [Petitioner] seem dangerous." Docket Entry No. 1-1, at 24-25. However, the trial counsel's line of questioning did not violate any constitutional safeguards. Here, having Trainor and Campbell's statements to police that Petitioner had, at all times (and, thus, at the time of Ruiz's shooting), a carbine that: (a) used bullets different from the one that shot Ruiz; and (b) so distinct visually from any "handgun" that even an uninformed observer seeing that carbine only briefly would not mistake it for a "handgun," Petitioner's counsel had a legitimate strategic reason to probe the issue to show that Petitioner was not the person who shot Ruiz with a "handgun" using .38 bullets. Such strategy was especially warranted because Campbell stated to police that

---

 holding _that_ "handgun."

44

Petitioner related to him the fact of Petitioner having the SKS in his possession on the very night of the shooting.[25]

Petitioner now tries to second-guess his defense counsel's strategy by pointing out that counsel's strategic choice did not bear fruit. However, the assessment of counsel's performance must be made without using the benefit of hindsight.[26] See Strickland, 466 U.S. at 589. Since Petitioner's challenges based on his counsel's question about the SKS fail to meet the Strickland test, the state court's dismissal of these challenges was not an unreasonable application of Supreme Court precedent.

### 3.   Claims Consolidated into Ground Seven

Petitioner also consolidated multiple claims into his Ground Seven. The first set of these consolidated claims mimics those asserted in his Grounds One and Two, see Docket Entry No. 1-1, at 39, and, thus, will be addressed in conjunction with the Court's examination of those challenges. The next set of claims asserts

---

[25] According to Petitioner, Campbell stated to the police that "[Petitioner] didn't mention the name of the weapon he was using [on the night of the shooting,] he just said he pulled out a gun [to shoot Ruiz], but he kept mentioning, that, ah, about the SKS [which] he carried . . . everywhere, and he did have the SKS present at the time." Docket Entry No. 18-43, at 25.

[26] Moreover, the statements made by Campbell and Trainor were not in contradiction: both stated that Petitioner had the SKS at all times and carried it around, and both stated that Petitioner did not elaborate on the particular gun he used to shoot Ruiz. The distinction ensuing from Campbell and Trainor's statements offered no material difference: it was so minor that Petitioner's counsel's choice not to dwell on it was strategically reasonable.

that the assistance rendered by the trial counsel violated the constitutional safeguards because his counsel failed to depose the State's witnesses that, thus, had to take chances by questioning these witnesses on the stand, eliciting some statements that – contrary to counsel's apparent hopes – did not benefit Petitioner.  See id. at 39-40.  The third line of claims further elaborates on the same, maintaining that his counsel violated Petitioner's rights by making a request for a continuance.  Id. at 40.

### a.  Claims Asserting Failure to Conduct Pre-Trial Depositions

Petitioner alleges that his counsel should have deposed Campbell and Trainor (as well as another State witness, Sergeant Severino, a fingerprint expert ("Severino")) prior to trial.  See id. at 39 (asserting that this alleged oversight "ma[de] counsel look absurd and defense flawed, [and the] fact [of] counsel not conducting any interviews of [the S]tate's witnesses shows his cross[-]examination was nothing save improptu polemics [because] counsel did his investigation while [these witnesses] were on the stand") (emphasis supplied by Petitioner).

Petitioner, seemingly, is of the opinion that his counsel could have conducted pretrial depositions of the State's witnesses.  Petitioner errs.

Under Brady v. Maryland, 373 U.S. 83 (1963), the prosecution has the duty, under the Due Process Clause, to insure that

46

criminal trials are fair by disclosing evidence favorable to the defendant, "[t]here is no general constitutional right to [any witness] discovery in a criminal case," Weatherford v. Bursey, 429 U.S. 545, 559 (1977), and the holding of "Brady did not create one [since] 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'" Id. (quoting Wardius v. Oregon, 412 U.S. 470, 474 (1973)).

Moreover, "there is no constitutional or statutory right to pretrial disclosure of [even such thing as the State's] witness lists," that is, unless the case is a capital criminal matter. United States v. Lewis, 594 F.3d 1270, 1280 (10th Cir. 2010) (citing Weatherford, 429 U.S. at 559, and noting that the Weatherford Court expressly rejected the notion that the Due Process Clause required the government to disclose even the name of its adverse witnesses so the defense could, at least, "do a background check" on these witnesses 'for purposes of cross-examination"); see also Cicenia v. Le Gay, 357 U.S. 504, 511 (1958) (prosecutor's refusal to supply a criminal defendant with pre-trial witness discovery cannot violate due process); Leland v. Oregon, 343 U.S. 790, 801-02 (1952) (same); People v. Gonzalez, 51 Cal. 3d 1179, 1258 (1990) (the Constitution does not confer a general right to criminal discovery in either state and federal matters).  Here, Petitioner faults his counsel for

failing to do what his counsel simply could not do.  Thus, his challenges fail to meet either prong of the <u>Strickland</u> test, and the state courts' dismissal of these challenges was not an unreasonable application of Supreme Court precedent.

### b.   Request for Continuance

Building on his impression that his defense counsel violated his Sixth Amendment rights by not deposing the State's witnesses pre-trial, Petitioner paraphrases his above-discussed claim into an assertion that a request for continuance made by his counsel "in the middle of the trial" was a violation of Petitioner's rights, since Petitioner believes that "it show[ed] that [the defense counsel] was completely remiss [and] did not have all the discovery he needed at the start of trial."  Docket Entry No. 1-1, at 40.[27]  Petitioner's position is without merit for the reasons detailed <u>supra</u>.  Moreover, the trial counsel properly performed his duties by seeking a continuance.  The fact that the trial counsel's request did not yield a favorable court ruling by no means rendered the counsel's request constitutionally

---

[27] The circumstances of defense counsel's request for continuance and the denial of that request indicate no abuse or undue delay on the part of the defense counsel.  <u>See</u> Docket Entry No. 18-43, at 70  ("The [trial] court [to the defense counsel]: I have bad news.  . . .  Judge Conway will not grant [your request for] continuance.  Apparently . . . even though we have a murder trial, [he just] do[es]n't want to hear [anything about it] – but we'll deal with that later").

defective.  Hence, this claim – being an unexhausted challenge –
will be dismissed under this Court's § 2254(b)(2) mandate.

### 4.  Ground Six

The facts and claims of Petitioner's Ground Six are less
than clear.  The Court surmises that, during Petitioner's grand
jury proceedings, the State called an investigator with the
Homicide Unit of the Camden County Prosecutor's Office, Kevin
Scott Kellejan ("Kellejan").  See Docket Entry No. 1-1, at 35-37.
Apparently, Kellejan was investigating Ruiz's murder and, at some
point, interviewed Robles by offering Robles a photo array on the
basis of which Robles identified Petitioner for the record.  See,
generally, Docket Entry No. 18-43, at 62-69.  During Petitioner's
grand jury proceedings, Kellejan testified to that effect and, in
addition, acknowledged his familiarity with the content of the
statement Robles made to police immediately post-shooting, that
is, long before Kellejan got involved in the case.  See id. at
69.[28]  At trial, during direct examination, Kellejan testified
solely about the process of conducting the photo array.
Petitioner's counsel cross-examined Kellejan on the same issue by

---

[28] See also Docket Entry No. 18-53, at 3 (during the grand
jury proceedings, Kellejan at no point vouched for the truth of
the statement Robles made to the police post-shooting.  The
prosecutor merely asked Kellejan "[D]id Mr. Robles report to the
officers that responded that two black males wearing masks took
him and his friend at gunpoint from the street into the building
and demanded money" and Kellejan answered only, "That is
correct").

49

asking the line of questions suggesting that Robles'
identification of Petitioner was nothing but a case of "cross-
racial misidentification." At the very end of that cross-
examination, trial counsel attempted to ask Kellejan a question
about Kellejan's grand jury statement about his familiarity with
Robles' post-shooting statement to police.[29] See id. That
intended inquiry caused the prosecutor's objection on hearsay
grounds, and the trial judge's finding that the objection was
proper.[30] Petitioner, however, maintains that: (a) the trial
judge erred in sustaining the prosecutor's objection; (b)
Petitioner's defense counsel must have violated Petitioner's
rights by being "unable to articulate the legal basis for"
allowing him to question Kellejan about the post-shooting
statement Robles made to the police; (c) such inability "to

---

[29] The goal of that line of questioning was, seemingly, to
suggest that Robles' testimony was unreliable because – in his
post-shooting statement to police – Robles asserted that he was
robbed and Ruiz was killed by two black men wearing masks.
Robles later recanted the "masks" part of his statement. He was
extensively questioned about his recantation by the trial
counsel.

[30] See Docket Entry No. 18-43, at 69-70 ("[The prosecutor]:
Objection, Your Honor. . . . [M]ay we approach?" "The Court:
Yes." . . . "[The prosecutor]: Well, that wasn't said to
[Kellejan, it was said by Robles to the police officers who took
his statement right after the shooting]. So [Kellejan cannot
testify to it because] that would be –" "The court: . . .
hearsay." [Defense counsel: But. at the grand jury proceedings,]
he testified [that he was made aware of Robles' statement to
police]." "[The prosecutor]: Hearsay's permissible in Grand
Jury, right?" "[Defense counsel]: I know that." "The Court:
Okay. [Sustaining the objection]").

articulate himself" cased the defense counsel to "never deliver to the jury what he said he would in the opening statement";[31] and (d) allowed Kellejan to remain "unimpeached." <u>See</u> Docket Entry No. 1-1, at 35-36 (asserting that the trial judge must have been unaware of the state rule of evidence, pursuant to which a statement qualifies as inadmissible hearsay only if introduced as a proof of the truth of the matter, and maintaining that Petitioner's counsel should have endeavored to persuade the trial judge about this legal point).

To the extent Petitioner asserts errors on the part of the trial judge in construing state law and entering an erroneous evidentiary ruling, this claim is unexhausted and, in addition, cannot warrant habeas relief. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a

_____

[31] Defense counsel's opening statement included the following three sentences:

> . . . Investigator Kellejan who will be testifying here from the State says to the Grand Jury that he was told that it was two black males wearing masks. Now [Robles had not have maintained that position for awhile] but the investigator tells this to the Grand Jury that this occurred. And this is something that will be presented during the defense's case-in-chief.

Docket Entry No. 18-42, at 20.

finely-tuned review of the wisdom of state evidentiary rules");

_Keller_, 251 F.3d at 416 n.2 ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence").

Petitioner's counsel's election to accept the trial court's ruling on the prosecutor's objection was a strategic choice facially valid under the first prong of _Strickland_.  _See Cornell_, 2008 U.S. Dist. LEXIS 61154, at *18 and n.4.

To the extent Petitioner asserts that the lack of Kellejan's testimony deprived Petitioner of his Sixth Amendment rights because his counsel did not "deliver" a piece of evidence outlined in the opening statement, Petitioner's position fails to meet the second prong of _Strickland_.  Because the credibility of Kellejan's at-trial testimony could not have been affected by a disclosure of the fact that Kellejan was _aware_ of the content of Robles' post-incident report to police, no prejudice could have ensued.  Thus, Petitioner's Ground Six warrants no habeas relief: to the extent these challenges (being scattered among the claims presented to the state courts in Petitioner's multiple PCR submissions) were dismissed by the state courts, such dismissal was not an unreasonable application of Supreme Court precedent,

while the remainder of these challenges is subject to dismissal under § 2254(b)(2).[32]

### 5. Ground Five - Severino Claim and the Confusion During PCR

Petitioner's Ground Five consists of two sets of claims. One of them recites his prior claim that his counsel violated his rights by not deposing the State's fingerprint expert, Severino, pre-trial. See Docket Entry No. 1-1, at 32-33.[33] That argument

---

[32] For the reasons unclear to the Court, Petitioner also asserted in his Ground Six that his rights were violated when Kellejan testified during the grand jury proceedings about Campbell's telling Kellejan that Petitioner related to Campbell how he was "chasing" his victim upstairs. Even if that grand jury testimony is presumed to be perjurious, it would not warrant habeas relief since the right to a grand jury has not been applied to the States via the Fourteenth Amendment. See Apprendi v. New Jersey, 530 U.S. 466, 499 (2000) (citing Hurtado v. California, 110 U.S. 516, 538 (1884)). Thus, Petitioner's challenge to any aspect of his grand jury proceedings cannot raise a question of federal law: it would be subject to dismissal as not cognizable in habeas review. See 28 U.S.C. § 2254(d); see also Stumpf v. Alaska, 78 F. App'x 19, 20 (9th Cir. 2003).

[33] This claim also includes a claim asserting that the trial counsel violated Petitioner's rights by being "unable to defend" his "pontificated" opening statement about lack of physical evidence connecting Petitioner to Ruiz's shooting. Petitioner maintains that counsel's invitation to the jurors to exercise their common sense was rendered senseless when Severino: (a) testified by conceding that, except for Robles' own fingerprints, there were no identifiable fingerprints on Robles' items Petitioner touched during his robbery of Robles; but (b) noted that these items contained other, smudged, fingerprints that were not identifiable, and such "not-identifiable" fingerprints were common. Both the language and the spirit of the trial counsel's opening and closing statements referring to one's common sense were based on the lack of Petitioner's identifiable fingerprints, not on the lack of any other fingerprints, of any kind.

is invalid for the reasons already detailed _supra_: Petitioner's counsel could not conduct any pre-trial depositions.

The other claim appears to be the following:

a.   It was undisputed and stipulated by all sides that Ruiz was shot by a .38 bullet from "a" handgun.  Robles testified that he saw that handgun in Petitioner's hands when he was robbed at gun-point immediately prior to the shooting, and Robles also saw the same handgun in Petitioner's hands when he witnessed Petitioner running out of the building right after the shooting.  No handgun was ever recovered. Consequently, it could not have been checked for fingerprints by either side.

b.   During the lengthy PCR hearings, which were being presided by Honorable Louis F. Hornstine, who was a tribunal different from the judge who presided over Petitioner's trial, the claim arose that Petitioner's trial counsel should have retained a fingerprint expert.  Confusingly, this claim persisted throughout the case, at all levels, even though, as discussed above, such claim should have failed _ab_ _initio_, because no firearm was ever recovered.  In fact, even Petitioner's PCR counsel believed that the handgun used to shoot Ruiz was, in fact, recovered but Petitioner's trial counsel elected not to fingerprint it. _See_ Docket Entry No. 18-30 (asserting that such

fingerprinting analysis could have produced exculpatory

evidence for Petitioner).  The Appellate Division even

ruled:

> With regard to [Petitioner's] claim that his trial
> counsel was deficient in not consulting a fingerprint
> expert to test the gun used in the shooting, we agree
> with the PCR judge that this particular strategic
> choice also was justifiable.  As the PCR judge aptly
> pointed out, such a fingerprint analysis could have
> "open[ed] the Pandora's box" to unfavorable
> information, including a potential finding that
> defendant's own fingerprints were on the weapon.
> Instead of having the gun tested by a fingerprint
> expert, trial counsel sensibly argued in his summation
> that the State's own investigation was deficient in not
> presenting to the jury any evidence of [Petitioner's]
> fingerprints on the gun.

Docket Entry No. 18-35, at 13-14.[34]

c.    However, in his petition for certification, Petitioner

alerted the error to the Supreme Court.  See, e.g., Docket

---

[34] The Court, having reviewed Petitioner's trial transcripts,
could not locate a single word indicating that Petitioner's trial
counsel asked a question or made a comment, or a summation
argument suggesting, even vaguely, that the State's investigation
was deficient or that the State, could but did not, analyze the
fingerprints on the handgun.  See, generally, Docket Entries Nos.
18-42 to 18-44.  Rather Petitioner's trial counsel argued that
not a single fingerprint detected on the items Petitioner touched
during Robles' robbery was identified as Petitioner's
fingerprint.  See Docket Entry No. 18-44, at 3, 7 (Petitioner's
trial counsel's summation argument that stated, "What we have
here is a case where there's no physical evidence.  If we had a
gun with [Petitioner's] fingerprints on it and that gun could be
matched up to [Ruiz by bullet analysis], that – that would be
something.  That would be some sort of physical link . . . .
[Y]ou heard the testimony of the State's own witness that [the
State] attempted to find [Petitioner's finger]prints on [the
items touched by the person who robbed Robles]. . . . [They found
some smudged fingerprints but] they did not find [identifiable
Petitioner's] prints on these objects").

Entry No. 18-38, at 8.  The New Jersey Supreme Court

subsequently denied Petitioner certification.

Claiming now that "a chimera" was created out of his

original challenges, see Docket Entry No. 1-1, at 33, Petitioner

seeks habeas relief on the grounds that the underlying

proceedings were "pure fiction."  See id. at 34.  Petitioner's

request for habeas relief is without merit.  While the state

courts' determinations were, indeed, an unreasonable application

of Supreme Court precedent simply because the state courts

correctly identified the governing principle but applied it to

facts that did not exist, i.e., failure to fingerprint a gun that

was never recovered, Petitioner's challenges are not cognizable

in habeas review.  Section 2254 permits a federal court to

entertain only claims alleging that a person is held in state

custody "in violation of the Constitution or laws or treaties of

the United States."  28 U.S.C. § 2254(a).  Therefore, habeas

review addresses only the claims attacking convictions, not

matters collateral to those convictions.  See Hassine v.

Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("[t]he federal role

in reviewing an application for habeas corpus is limited to

evaluating what occurred in the state or federal proceedings that

actually led to the petitioner's conviction; what occurred in the

petitioner's collateral proceeding does not enter into the habeas

calculation"), cert. denied, 526 U.S. 1065 (1999); see also Rudd

v. Johnson, 256 F.3d 317, 319-20 (5th Cir.) (unless state collateral review violates some independent constitutional right, infirmities in those proceedings are not cognizable under § 2254 and do not warrant federal habeas relief ), cert. denied, 534 U.S. 1001 (2001).  Claims attacking statements made during PCR proceedings or oversights by PCR tribunals are not cognizable. See 28 U.S.C. § 2254(i); Lambert v. Blackwell, 2003 U.S. Dist. LEXIS 5125 (E.D. Pa. Apr. 1, 2003) (claims of errors by the PCR court fail to assert viable federal habeas claims); Rollins v. Snyder, 2002 U.S. Dist. LEXIS 2380 (D. Del. Feb. 13, 2002) (claims based on the state courts' actions during the PCR proceedings are not cognizable in habeas review).  Here, no handgun was recovered.  As such the trial counsel could not have had it fingerprinted.  Hence, no events triggering habeas relief took place.  Therefore, Petitioner's Ground Six, in its entirety, warrants no relief.

### 6. Grounds Building on the Alibi Assertions Examined at PCR Hearings

In his Grounds One and Two, Petitioner further builds on the record developed during his PCR proceedings.  Petitioner asserted that his trial counsel was ineffective for failing to call, as defense witnesses, two persons, Douglas Scott ("Scott") and Deshaun Milton ("Milton") – who, according to Petitioner's PCR position, could have provided him with an alibi.  Judge Hornstine

57

held hearings during which both Scott and Milton testified at length.[35]

### a.  Background as to Scott

During Petitioner's PCR hearings, Scott acknowledged being "real close friends" with Petitioner's brother; Scott also testified to his extensive criminal history, his resentment for law enforcement and to being a career criminal.  Docket Entry No.

---

[35] As noted above, Petitioner's original alibi theory was presented in the notice of alibi filed by his prior defense counsel.  See Docket Entry No. 1-2, at 7.  The notice corresponded to Petitioner's PCR testimony about his version of events.  Accord Docket Entry No. 18-49, at 34-38.  Specifically, during his PCR hearings, Petitioner maintained that, on the date of the incident, he injured his ankle, called his girlfriend, who came over together with her mother Edith ("Edith") and picked drove him to their residence, where Petitioner stayed the remainder of the day and the following night in the company of this girlfriend, Edith and Edith's son, Terrell Williams ("Terrell").  See id. at 34-35.  However, these "alibi witnesses" made statements denying that they picked him up, maintaining that he was brought in by another person, and averring that his ankle injury occurred on the day other than the date of Ruiz's shooting/Robles' robbery.  See id. at 35-37.  Since Petitioner insisted that these witnesses were mistaken and that his ankle injury was so severe that he had to go to a hospital for a medical treatment, the trial counsel obtained a release form so to get the hospital records.  See id. at 36-37.  The records, however, revealed that Petitioner visited the hospital on March 9, 1997, that is, three days after the shooting/robbery.  See id. at 37-38.  Being confronted with that fact, Petitioner asserted that he went to the hospital not on the day of his injury but the next day.  See id.  Being pointed out that the date preceding his hospital visit was March 8, 1997 (that is, two days after Ruiz's shooting/Robles' robbery), Petitioner then took the position that "hospital records [were] dubious [simply because Petitioner felt they were not] accurate [since Petitioner elected to not] consider them accurate [and so he was] going to stick with that [story]."  Id.  In light of these shortcomings, this first alibi theory was never presented.

58

18-51, at 3, 7, 9, 15 (reflecting Scott's "18 . . . [m]ajor convictions," his use of so many aliases that he eventually started being criminally charged under different names and his strong resentment toward police).   With respect to the events allegedly providing Petitioner with an alibi, Scott testified:

> [T]hat evening . . . I was gambling . . . .  It was a losing night.  . . .  So, I was stressing.  Then I said . . . I needed some weed.  . . .  And I went to get some weed.  . . . I pulled up in my car, . . . and I jumped out . . . to the Acres . . . .  I see a few fellows . . . [a]nd I was talking to somebody and I was like, where can I get the weed from? . . .  Around the same time two Spanish dudes walked up from . . . they was [sic] going to the building.  The same dude, the black – dark-skinned dude – I think his [nick-name] was [either] Rayquan . . . or something like . . . . Ramez . . . he was saying it's in the building.  . . .  I was still talking.  . . .  But then I stepped off to go into the building behind the Spanish dude and the dude[,] . . . [t]he dark-skinned guy . . . .  I didn't go right behind them though.  I didn't go immediately behind them. . . . Maybe like 30 seconds to a minute . . . .  And when I . . . open the door, I heard a gunshot.  And I looked in, and the Spanish dude was . . . running down.  So, I got and ran and jumped in my car.

Id. at 4-6.

The following report was produced by two investigators who interviewed Scott:

> [Scott stated to us] that he does know the [actual] name and [even the] address of the person [who] shot and killed [Ruiz], but [Scott] would not reveal his identity unless he was given a consideration for sentencing in [his then ongoing, unrelated to Ruiz's murder and Robles' robbery] case. [We] informed [him] that we could not do that. . . . He continued to maintain that he would not reveal this person's name or address, of which he said that he knew, unless he was given consideration in a sentence [he was facing in his case].  We continued to maintain that we could not do that, but it was important that we needed to have the information that he stated that he could provide. . . .

Scott refused to do so and he was subsequently taken back to the Camden County Jail.

Docket Entry No. 1-2, at 3.

Not obtaining any prosecutorial consideration for the information he allegedly possessed, Scott – unlike Campbell – remained quiet.  Only when Scott finished serving his prison term (and, thus, after Petitioner was convicted), Scott mentioned to Petitioner's mother that he allegedly knew something.  He disclosed the specifics only years later – for the purposes of Petitioner's PCR hearings.  See id. at 7-8, 12.  During these hearings, Scott admitted never knowing either the real name or address of the shooter, but stated his opinion that the shooter must have been someone nick-named something like "Rayquan" or alternatively, something like "Ramez".  Scott also stated his belief that the shooter was "four or five/six shades . . . darker" in skin tone than Petitioner.  See id. at 6, 10-11.

Petitioner's trial counsel testified at the PCR hearing:

[N]ow, reading [the investigators' report about their meeting with Scott], I remember there was an individual who said he knew who really [shot Ruiz and robbed Robles], but [that individual] wouldn't give the [information] unless he was given consideration [by the prosecutors] for his sentence [in his own criminal proceeding].  . . .  And I remember actually saying to [Petitioner],  . . . what if [this individual, being the States witness,] gets up [on the stand] and says, [Petitioner is] the one who did it . . . . [I did not want to even risk interviewing this individual, since I feared that, if] I interview him, he says, yeah, I know who did it, [Petitioner] did it.  What do I do then? . . . I [would] have to turn that report over [to the prosecutor].  If I have a statement [from] someone's listed as "a State's witness," in a police file, and [the

60

prosecutor] gets one version of [the events from this
individual, while] I get a different version, . . . I'm not
allowed to go and sandbag the [prosecutor] on the day of
trial, and put that [individual on the stand], and show
[the] statement [that this individual gave me].  It's going
to cause a mistrial, and that won't benefit [Petitioner] . .
. .

Docket Entry No. 18-49, at 17-19.[36]

### b.    Background as to Milton

By the time of Petitioner's PCR hearings, Milton, who had

five previous convictions,[37] was in the midst of serving a three-

to-five year sentence.   Milton described the allegedly

exculpatory events as follows:

[I]t was dark, like probably 9:00/9:30 [P.M.] . . . like
nine/ten . . . . It was at night. . . . As I was going . . .
to 32nd street . . . I <u>thought</u> I seen [Petitioner] on

---

[36] PCR counsel construed the trial counsel's testimony as a
misreading of N.J. Ct. R. 3:13-3(b) (not requiring defense's
disclosure to the State of the material unintended to be used at
trial), <u>see</u> Docket Entry No. 18-50, at 4, and Petitioner adopted
his PCR counsel's position in the instant action.  <u>See</u> Docket
Entry No. 1-1, at 16.  However, the trial counsel's statement
"I'm not allowed to . . . sandbag the [prosecutor] on the day of
trial and put that [on the stand]" shows that the trial counsel
was referring to a scenario where the testimony is offered at
trial. The remainder of trial counsel's concerns derived from
case law unrelated to Rule 3:13-3, such as <u>State v. Olwell</u>, 394
P.2d 681 (Wash. 1964) (a defense lawyer must come forward on his
own and produce to the State a piece of physical evidence the
attorney obtained from his client if that evidence incriminates
the client), and <u>Morrell v. State</u>, 575 P.2d 1200 (Alaska 1978)
(expanding <u>Olwell</u> to find a defense attorney's obligation to turn
to the State an incriminating-the-client plan which the attorney,
acting on a tip, obtained not from the client but from a
potential witness).

[37] In his state court criminal prosecutions, Milton is
designated as "Deshand Milton a/k/a Deshon Milton" as rather than
"Deshaun Milton."

Westfield. And it's like 20 seconds from [the place where
Ruiz was shot and Robles was robbed if one is driving] in
the car, but . . . on feet it takes like about [four or]
five minutes . . . . I was driving. . . . [W]hen I rode .
. . I <u>thought</u> I seen [Petitioner] like where . . . you park
at, where the stores at. <u>I thought it was him</u>. . . . <u>It</u>
<u>appeared – I mean, I thought it was him</u>. . . . I just
looked to my side [through the passenger window]. . . . He
<u>appeared to be</u> on the side [of the street, coming out of a
store]. So, I just kept going, turned, ma[d]e a left. . . .
I mean, riding down the block, . . . turn . . . on 32nd
Street. I get out [of] the car. My girl parked the car in
front of this building. . . . Like a minute [passed by]. . .
.

Docket Entry No. 18-50, at 7-8, 11.

[At that point,] I was standing at the phone booth, but
looking across the street, because . . . these girls, they
held my attention . . . . And as I was looking over there,
[some] dude [I know] told me like, . . . I got you. I said,
what you mean you got me. He said no, it's some funny shit.
You know, this and this. I'm like, what? . . . And he
said, no, they're going – he said, Rat and them doing
something right now. I'm like, doing what? He said, they
doing something. . . . [A]nd then I'm looking, and then I
backed up into . . . this alleyway. Then, like seven or
eight seconds later, I hear a gunshot. Then, I see somebody
running. He run past me. I see a lot of people running, .
. . and I'm still looking. And . . . my girl pulls up. And
. . . then I jumped in the car, then I leave.

<u>Id.</u> at 6, 18.[38]

    Milton was interviewed twice by prosecutorial investigators

about a half a year after the shooting, when he was already

charged with criminal offenses unrelated to Ruiz's death or

_____

    [38] Milton's PCR testimony and underlying statements given to
prosecutorial investigators are difficult to comprehend because
of the numerous nicknames. For instance, Petitioner, also known
under his alias "Stephon Baum," was referred to under the nick-
name "Sleep." <u>See</u> Docket Entry No. 18-50, at 7. Analogously,
other individuals were referred to by Milton under their street
nick-names, such as "Rat-Rat," "Wadoo," "Shakur," "Dano," etc.

Robles' robbery.  See id. at 18-19; see also Docket Entry No. 1-2, at 10, 24.  During those interviews, Milton stated that, being then held in the same facility where Rat-Rat was housed in connection with Rat-Rat's own, unrelated crimes, Milton talked to Rat-Rat who stated that he wished to pass to Shakur that Rat-Rat had heard "something" from Wadoo about Wadoo's hearing "something" from Dano, which indicated to Rat-Rat the shooter's identity, although Rat-Rat was not disclosing that identity and was planning on "ain't saying anything."  See Docket Entry No. 1-2, at 30-31.  Milton also clarified that Rat-Rat and Petitioner sold drugs in the area adjacent to the Westfield Acres (where, allegedly, another group of drug dealers was operating).  See Docket Entry No. 18-50, at 16.  Finally, Milton averred that, about a week after Ruiz's shooting, Milton and Petitioner had a brief "argument" during which Petitioner displayed a brown-color "handgun, automatic . . . [and] it was [a] .38 or a [.]40" caliber weapon.  See Docket Entry No. 1-2, at 28; accord Docket Entry No. 18-50, at 15.

Petitioner's trial counsel testified during Petitioner's PCR hearings by stating that "there were certain issues regarding the reliability of [Milton's] testimony which would [not] have allowed [the trial counsel] ethically, and under the [R]ules of [C]ourt, to call [Milton] as a witness."  Docket Entry No. 18-

49, at 7.[39]  The trial counsel pointed out that he discussed those problematic issues with Petitioner, and the decision not to call Milton as a defense witness was made with Petitioner's understanding and agreement.  See id. at 8.

### c.   The State Courts' Findings

The state courts dismissed Petitioner's challenges asserting that his Sixth Amendment rights were violated because the trial counsel did not call Scott and Milton as defense witnesses, observing:

> The PCR judge found the strategic choices of trial counsel
> to be reasonable, noting that counsel endeavored to:
>
>> maximize the inconsistencies with[in] the State's case
>> and tried to minimize anything further by way of
>> problems that he would have created had he called to
>> the witness stand the Miltons and the Scotts of the
>> world . . . . [T]here is ample support in the record to
>> justify trial counsel's strategic decision not to
>> present their testimony.  Each of these two witnesses
>> would have been readily impeached by the prosecutor if
>> they had testified.  . . .  Milton's proposed testimony
>> contradicted defendant's own alibi account, which
>> indicated that he had stayed at the house of . . .
>> Tawana Williams that night due to an ankle injury.  . .
>> .  Scott was a close friend of [Petitioner's] brother.
>> He, too, had a lengthy prior criminal record . . . that

---

[39] By the time of his PCR hearing testimony, Petitioner's trial counsel remembered only that Milton's statements had certain inconsistencies; the trial counsel was not clear as to what exactly was stated in Milton's first and second statements: the few specifics he remembered were limited to the observation that there were some references to a certain car and to Milton having some form of an encounter with Petitioner.  See Docket Entry No. 18-49, at 8 (indicating the trial counsel's belief that, in his second statement, Milton might have said that Petitioner was in Milton's car rather than Milton merely had a brief glance at someone who reminded him of Petitioner).

would have exposed him to impeachment.  According to
Scott's testimony . . . , he identified another person
as the shooter, allegedly having seen that individual
that evening . . . .  Scott did not provide this
information when he was interviewed by the police. . .
. [He] refused to identify the shooter . . . unless the
State would agree to mitigate his exposure to [his own]
criminal charges . . . .

For these many reasons, we sustain the PCR judge's negative
assessment of the credibility of Milton and Scott at the PCR
hearing, and the judge's ultimate finding that trial counsel
acted reasonably in eschewing their testimony at trial.

Docket Entry No. 18-35, at 9-12.

### d.    Petitioner's Position

Petitioner now challenges the above-quoted state findings

maintaining that his trial counsel's elections not to call either

Scott or Milton as defense witnesses resulted in an error of

constitutional magnitude.  As to Scott, Petitioner asserts that

the trial counsel's decision was "flawed" because: (a) Petitioner

hypothesizes that the trial counsel's PCR statements must have

been indicative of the trial counsel's misreading of N.J. Ct. R.

3-13:3; and (b) Petitioner believes that the trial counsel's

concern about Scott being a potentially inculpatory witness were

unwarranted.  See Docket Entry No. 1-1, at 14-16.  Petitioner

maintains that Scott's testimony would ring credible simply

because: (a) Robles testified at trial to seeing a dark-skinned

bearded African-American male about 35 or 40 years old who stood

nearby; (b) Scott testified during the PCR hearings that he stood

nearby; and © Scott is a dark-skinned black male who wears a

beard which, according to Petitioner, makes Scott "look[] much older" than Scott is.  Petitioner also claims that prior and throughout his trial, he systemically expressed his wishes for Scott to be called as his witness.  See id. at 14-20 (elaborating on the same at great length).

As to Milton, "Petitioner maintains that there [was] nothing strategic or intelligent in [the trial] counsel's failure to call this witness [since the trial counsel initially] placed him on the witness list" and, thus, Petitioner believes that the trial counsel's reassessment of that list could not have been a constitutionally valid choice.  Id. at 21.  Basing his position on the fact that his trial counsel's recollections of the events associated with the trial were vague and, at times, erroneous, when the trial counsel was testifying at Petitioner's PCR hearings almost six years later, Petitioner seeks habeas relief on the grounds of his trial counsel's poor memories, qualifying this forgetfulness as an indication of counsel making constitutionally invalid strategic choices at the time of Petitioner's trial.  See id. at 21-23.

> ### e.  Petitioner's Grounds One and Two Merit No Habeas Relief

The state courts' determinations as to Petitioner's challenges based on Scott and Milton's testimonies was not an unreasonable application of Supreme Court precedent.  While Petitioner selects lines from the transcript of his trial

counsel's PCR testimony to argue his counsel's poor recollections of what transpired before and during Petitioner's trial, <u>see</u> Docket Entry No. 1-1, at 14, 21-22, the deficiencies of trial counsel's memories at any stage after the trial are simply irrelevant in habeas review.   <u>See</u> <u>Hassine v. Zimmerman,</u> 160 F.3d at 954.

Moreover, and contrary to what appears to be Petitioner's belief, Petitioner cannot "trap" his trial counsel on the bases of the statements the counsel made during the PCR hearings: for the purposes of habeas review, this Court is allowed to entertain any and all <u>theoretically</u> <u>possible</u> strategic considerations that Petitioner's trial counsel could have made in support of his actions actually taken.[40] <u>See</u> <u>Marrero v. Horn</u>, 2012 U.S. App. LEXIS 24420, at *17 (3d Cir. Nov. 28, 2012) (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1315 & n.16 (11th Cir. 2000), for the observation that ineffective assistance inquiry is objective and, therefore, even if the "trial counsel (at a post-conviction evidentiary hearing) [outright] admits that his performance was deficient [that admission] matters little" for the purposes of habeas review); <u>see</u> <u>also</u> <u>Chandler</u>, 218 F.3d at 1316 (since the

_____

[40] Such presumption is particularly warranted here, since the trial counsel repeatedly averred to having very limited recollections of Petitioner's pre-trial and trial events by the time he testified at the PCR hearings. <u>See</u> Docket Entry No. 18-48, at 12-15, 28, 31; <u>see</u> <u>also</u> <u>id.</u> at 23, 30 ("I mean . . . – it's five years ago.  I don't remember . . . . I have no idea. I don't remember").

Strickland test is one of _objective_ reasonableness, it does not matter if the trial counsel actually considered the strategy selected: so long as a hypothetical reasonable attorney could have selected such hypothetical strategy, there could be no ineffectiveness).

The record here is against Petitioner's position.  Since both Scott and Milton were career criminals, their credibility would be a significant issue.  With regard to Scott, it is questionable altogether whether Petitioner's trial counsel could even obtain Scott's testimony; Because Scott was flatly refusing to disclose any information unless given a "consideration" by the prosecutors in his own case, and Petitioner's trial counsel had no power to render or even prompt such "consideration," there is nothing in the record showing that Scott would have testified to anything or even disclose any "leads" to Petitioner's trial counsel.  Indeed, even _after_ Petitioner was convicted, Scott merely hinted to Petitioner's mother that he knew "something," but did not disclose any specifics until the PCR hearings six years later.  Moreover, the information Scott could offer was of little value.  He claimed he knew the actual name and even the address of the shooter, but all he could offer were the nicknames "Rayquan" or "Ramez."  Moreover, his observations were less than reliable as they were vague and based on a brief encounter. Hence, it was a reasonable strategic choice by Petitioner's trial

counsel to avoid seeking any "deals" with and/or making any concessions to the prosecutors in a hope to obtain Scott's valueless testimony.

With regard to Milton, the facts are even more unfavorable to Petitioner. According to Milton, he was driving his car and, glancing for a brief moment through the passenger-side window, he saw someone who "appeared" to look like Petitioner. Milton maintains that his glancing at Petitioner was followed by: (a) Milton's driving first around the corner and then down the street; (b) Milton's process of parking his car; then (c) Milton's observation of the process of his girlfriend parking her car;(d) Milton's going to a phone booth;(e) Milton's monitoring the girls standing next to his car; (f) Milton having an at-least-eight-sentence conversation laced with pauses normal to discussions colored by confusion ("I got you." "[W]hat you mean you got me[?]" "[N]o, it's some funny shit. You know, this and this." "[W]hat?" "[N]o, they're going, Rat and them doing something right now." "[D]oing what?" "[T]hey doing something"); (g) Milton going into an alley after that conversation; and, finally, (h) the period of at least eight seconds prior to Milton hearing a shot. The alleged alibi offered by Milton ensues from his assessment that it would have taken an average person about four to five minutes to reach, on foot, from the point where Milton glanced at someone who looked

69

like Petitioner to the point where Ruiz was shot.  However,
Milton conceded that the same distance could be covered by 20
seconds by car.  Since the activities into which Milton engaged
from the moment of glancing and until he heard the shot were so
numerous and time consuming that Petitioner could easily walk to
the place of the shooting and, had Petitioner drove after exiting
the store, he would have ample time to commit both the robbery
and shooting.

Although Milton's testimony could offer no measurable alibi,
it would come at a great cost.  Petitioner's notice of alibi
asserted that Petitioner was spending the entire afternoon and
night at Edith's, with Terrell and Petitioner's girlfriend, due
to Petitioner alleged ankle injury.  Had the trial counsel
offered Milton's testimony, the prosecutor would expose the
inconsistency of Petitioner simultaneously being at Edith's
place, injured, and walking unharmed out of a store, being
glanced upon by Milton.  And, since Petitioner stated that he
"was going to stick" by his story about being at Edith's, the
prosecutor would probably call Edith and Terrell as witnesses to
show that the defense was proffering an outright lie.

Finally, if offered, Milton's testimony about Petitioner
displaying, just a few days after Ruiz's murder, a .38 caliber
handgun, _i.e._, the type of weapon used to shoot Ruiz, might have
been more damaging to Petitioner.

The trial record indicates, in no ambiguous terms, the trial
counsel's fluency in all factual aspects of Petitioner's case and
relevant legal principles, as well as clarity and consistency of
the trial counsel's strategic elections.[41]  While Petitioner now
insists that his trial counsel called no defense witnesses in
defiance of Petitioner's wishes, the record belies Petitioner's

_____

[41] The trial counsel emphasized his consistent intent to: (a)
keep the theory of the case as that asserting misidentification
on the part of Robles, the sole eyewitness; and, thus, (b) avoid
any risk of providing support to Robles' identification of
Petitioner.  The trial counsel testified:

> You have to [understand that strongest point of the
> prosecutor's] case was . . . based solely on [Robles']
> identification [of Petitioner], and my biggest fear [ensued
> from the fact that Petitioner,] at that time, had a very
> prominent gap in his mouth between his teeth. [I was
> intentionally avoiding any risk of having any witness
> testify about that rather unique feature in Petitioner's
> appearance since that feature] wasn't really mentioned
> anywhere in any of the reports or in the photo sketch [that
> looked a lot like Petitioner and was created on the basis of
> Robles' post-incident statement to police], and my fear
> truly was that this [fact that Petitioner had this prominent
> gap between his teeth] was going to come out from one of the
> other witnesses . . . and sink the [defense] at that point .
> . . . [My concern was that the [p]rosecutor could [just] ask
> [Petitioner] to open [his] mouth, and [the jurors would
> immediately] see that [gap created by the missing] tooth
> that [could have been] specifically mentioned by [such
> hypothetical] witness . . . . And [Petitioner and I,] we
> talked about [it] - - [Petitioner] said [that his] tooth was
> chipped after [Ruiz was shot and Robles was robbed.  So,]
> there was an issue [of] receiving his medical records.  But
> [when I obtained those records], his medical records showed
> that his tooth was actually chipped in [19]94, and the
> shooting occurred in [a9]97.

Docket Entry No. 18-49, at 17-19; Docket Entry No. 19-48, at 29.

position.  At the conclusion of the State's case, the following

exchange took place:

Prosecutor:            Your Honor – . . . [T]here is something that
                       I would like you to address with
                       [Petitioner]. . . .  He, through [his
                       briefly-serving original] counsel , filed a
                       notice of alibi in th[is] case. I just want
                       to make sure he understands . . . that by not
                       putting evidence on [he relies on his hope
                       that the State did not make its case beyond
                       reasonable doubt.]  I'm sure [his current
                       trial counsel] discussed the issue with him,
                       the pros and cons . . . and all that. . . .
                       [So,] I just want to make sure that's
                       addressed [on the record].

Trial judge:           Okay.  [Could the defense counsel please
                       question Petitioner for the record]?

Trial counsel:         Now, [Petitioner], there was notice of alibi
                       that was filed in this case sometime back . .
                       . by your [original] attorney at that time?

Petitioner:            . . . [Y]eah.  Yes.

Trial counsel:         Okay. [Do] you understand that you have a
                       right to present alibi witnesses if you so
                       choose?

Petitioner:            Yes.

Trial counsel:         Okay.  And do you understand you're giving up
                       that right by not testifying [yourself] and
                       by not presenting those witnesses as well?

Petitioner:            Yes.

Trial counsel:         Are you doing this freely and voluntarily?

Petitioner:            Yes.

Trial counsel:         Anyone forcing you to do this?

Petitioner:            No.

                       . . .

```
Prosecutor:          I am satisfied with that, Your Honor.
Trial judge:         Okay.
```

Docket Entry No. 18-43, at 85.

Now, having lost at trial, Petitioner asserts that he had always insisted on calling witnesses and yet his counsel ignored his requests. The record does not support this assertion. Consequently, the state courts' determinations as to the validity of the strategic elections made by the trial counsel were not an unreasonable application of Supreme Court precedent. Hence, Petitioner's Grounds One and Two warrant no habeas relief.[42]

Petitioner's Ground Nine presents a lengthy recital of all Grounds and claims already raised in his Grounds One to Eight. See Docket Entry No. 1-1, at 48-62. Petitioner maintains that the cumulative errors committed during his trial warrant issuance of a writ. However, relief on the basis of cumulative error is warranted only where the errors resulted in an unfair trial that made the resulting conviction a denial of due process. See Echols v. Ricci, 2012 U.S. App. LEXIS 14803, at *37, n. 13 (relying on Donnelly, 416 U.S. at 643). Here, not a single Ground or claim raised by Petitioner provided this Court with a basis to find that Petitioner was given an unfair trial making

---

[42] As noted supra, part of Petitioner's Ground Seven included, as one of the aspects, a paraphrasing of Petitioner's Grounds One and Two. See Docket Entry No. 1-1, at 38. For the reasons extensively detailed herein, this aspect of Ground Seven warrants no habeas relief.

his conviction a denial of due process.  Since, "[f]or the
reasons discussed above, each of the [Grounds and claims
Petitioner] raises does not amount to a due process violation,
nor does the sum of them."  <u>Echols</u>, 2012 U.S. App. LEXIS 14803,
at *37, n. 13.  Hence, Petitioner's Ground Nine challenges
warrant no habeas relief because the state courts' relevant
finding (that no cumulative error occurred) was not an
unreasonable application of Supreme Court precedent.

## V.    <u>CERTIFICATE OF APPEALABILITY</u>

Having all Petitioner's Grounds and claims dismissed on the
merits, this Court must now determine whether a certificate of
appealability should issue.  <u>See</u> Third Circuit Local Appellate
Rule 22.2.  A certificate of appealability may issue "only if the
applicant has made a substantial showing of the denial of a
constitutional right," 28 U.S.C. § 2253(c)(2), and "[a]
petitioner satisfies this standard by demonstrating that jurists
of reason could disagree with the district court's resolution of
his constitutional claims."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322,
327 (2003).

Here, Petitioner raised a multitude of Grounds and claims
into each Ground.  Have carefully received the extensive record,
the Court concludes that Petitioner has failed to make a
substantial showing of denial of a constitutional right.  The
Court is persuaded that jurists of reason would not disagree with

74

this conclusion.    Therefore, no certificate of appealability

will issue.

**VI.**   <u>**CONCLUSION**</u>

For the foregoing reasons, this Court dismisses the Petition

and denies Petitioner a writ of habeas corpus, pursuant to 28

U.S.C. § 2254.   No certificate of appealability will issue,

pursuant to 28 U.S.C. § 2253(c)(2).

An appropriate Order accompanies this Opinion.

s/Renée Marie Bumb
**RENÉE MARIE BUMB,**
**United States District Judge**

Dated: May 13, 2013